661 F.2d 864
 1981-2 Trade Cases 64,328
 MONTREAL TRADING LTD., Plaintiff-Appellant,
v.
AMAX INC., Amax Chemical Corporation, Duval Corporation,
Duval Sales Corporation, Ideal Basic Industries,
Inc., and International Minerals&
Chemical Corporation,
Defendants-Appellees.
 No. 79-1999.
 United States Court of Appeals,
Tenth Circuit.
 Argued Nov. 18, 1980.
Decided Oct. 14, 1981.
 
 Joseph M. Alioto, San Francisco, Cal. (Mario N. Alioto, San Francisco, Cal., with him on the briefs), of Alioto & Alioto, San Francisco, Cal., for plaintiff-appellant.
 Dale R. Harris, Denver, Colo. (Gale T. Miller of Davis, Graham & Stubbs, Denver, Colo. and Allen C. Dewey, Jr., of Madrall, Sperling, Roehl, Harris & Sisk, Albuquerque, N. M., with him on the briefs), for defendant-appellee Ideal Basic Industries, Inc.
 H. Blair White of Sidley & Austin, Chicago, Ill., for defendant-appellee Intern. Minerals & Chemical Corp. (with him on the brief Sullivan & Cromwell, New York City, for defendants-appellees Amax Inc. and Amax Chemical Corp., Baker & Botts, Houston, Tex., for defendants-appellees Duval Corp. and Duval Sales Corp., Davis, Graham & Stubbs, Denver, Colo., for defendant-appellee Ideal Basic Industries).
 Before BARRETT, LOGAN and SEYMOUR, Circuit Judges.
 LOGAN, Circuit Judge.
 
 
 1
 Montreal Trading Ltd., a Canadian corporation, brought this antitrust action against several United States potash producers, alleging that Montreal Trading was unable to purchase potash to sell to its customers because the defendants were engaged in a concerted refusal to deal with Montreal Trading and had deliberately limited potash production to drive up prices. Montreal Trading now appeals an adverse jury verdict finding that it suffered no damages. It argues on appeal the impropriety of a jury instruction precluding damages for any potash withheld from Montreal Trading that it planned to resell to customers in North Korea. On appeal, defendants argue that the trial court lacked subject matter jurisdiction over the complaint.
 
 
 2
 Montreal Trading trades commodities in the international market. The defendants in this case, Amax Inc., Amax Chemical Corporation, Duval Corporation, Duval Sales Corporation, Ideal Basic Industries, Inc., and International Minerals & Chemical Corporation, are all engaged in potash mining and production in the two sites in North America where such production exists: New Mexico and Saskatchewan, Canada.
 
 
 3
 In November 1973 Montreal Trading sent a Telex message to the Canadian offices of several of the defendants requesting prices for 50,000 tons of potash, and sent additional inquiries to other Canadian producers. The companies generally responded that they could not fill Montreal Trading's order, with some companies referring expressly to a shortage of potash. One producer expressed interest in negotiating until it discovered Montreal Trading was going to export the potash; it then referred Montreal Trading to Canpotex, a governmentally-established Canadian association that controls all exports of Canadian potash to countries outside North America. Montreal Trading did not negotiate with Canpotex, and after receiving rejections or no response to its other inquiries, it made no further efforts to purchase potash.
 
 
 4
 We read Montreal Trading's complaint as alleging that its inability to purchase potash resulted from both a concerted refusal of United States producers to deal with it, and a conspiracy among the producers, cooperating with the Saskatchewan government, to create a shortage of potash. The parties do not dispute that during the time periods critical to this case the Saskatchewan government prorationed and otherwise limited the production and exportation of Canadian potash. Prior to doing so, Saskatchewan's Premier, Ross Thatcher, visited New Mexico seeking assurances from that state's governor and from producers there that New Mexico potash production would not be increased in the wake of Canada's reduction. The parties vigorously dispute whether the United States producers agreed to limit production. While it is not dispositive of the issue, we note that the government brought Sherman Act criminal proceedings against the defendants and they were acquitted. See United States v. Amax Inc., 1977-1 CCH Trade Cas. P 61,467 (N.D. Ill. 1977).
 
 
 5
 At trial the defendants maintained that Montreal Trading could claim no damages from any inability to purchase potash since it intended to resell to customers in North Korea in violation of the Foreign Assets Control Regulations, 31 C.F.R. § 500.201(b). These regulations, adopted pursuant to the Trading with the Enemy Act, 50 U.S.C. App. § 5(b), prohibit any United States company, or any business that is owned or controlled by a United States business organization, wherever located, from selling any products whatsoever, directly or indirectly, to North Korea. See 31 C.F.R. § 500.329. Pursuant to this reasoning, the judge instructed the jury as follows:
 
 
 6
 "Two United States laws, the Trading with the Enemy Act and the Export Administration Act, prohibited the defendants during the relevant time period from directly or indirectly selling potash to North Korea. If you find that the plaintiff intended to resell to North Korea any of the potash which it sought to purchase from the defendants, then you must find that the plaintiff was not damaged by the defendants' conduct with respect to that transaction."
 
 
 7
 (R. XIV, 1113).
 
 
 8
 Montreal Trading alleges that the court's instruction was improper because the defendants had not even inquired whether Montreal Trading would resell to North Korean customers, because Montreal Trading might have resold part of the potash to customers outside North Korea, and for other reasons. We do not reach that issue, however, because we agree with defendants' contention that the district court lacked subject matter jurisdiction in this action.
 
 
 9
 As regards Montreal Trading's claim of an inability to purchase because defendants limited production as part of a price fixing conspiracy, defendants argue that as one who never purchased potash, Montreal Trading lacks standing to sue since any injury it suffered because of defendants' actions was too remote; and that only those who purchased potash at the artificially high price would have suffered a sufficiently direct injury to have standing to bring an action. As regards Montreal Trading's claim of a concerted refusal to deal, defendants argue that a refusal to sell Canadian potash to a Canadian company is not a transaction in "trade or commerce among the several states or with foreign nations," 15 U.S.C. §§ 1 and 2, and has too insignificant an effect on such commerce to justify federal court jurisdiction. We agree with both of these arguments.
 
 
 10
 The principal thrust of Montreal Trading's complaint is that defendants conspired to limit potash production in order to raise prices, and they were so successful that Montreal Trading was unable to buy potash it could have resold at a profit. To determine whether one alleging an inability to purchase a product has suffered an injury compensable under the antitrust laws, we must begin with the language of the statute:
 
 
 11
 "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor ... and shall recover threefold the damages by him sustained ...."
 
 
 12
 15 U.S.C. § 15.
 
 
 13
 While the statutory language is broad, the Supreme Court has held that the injury must result from the type of harm the antitrust laws were intended to prevent. See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). In addition, the Supreme Court has endorsed limitations on standing to sue for antitrust injury, an issue it has termed analytically distinct, Illinois Brick Co. v. Illinois, 431 U.S. 720, 728 n.7, 97 S.Ct. 2061, 2065-66 n.7, 52 L.Ed.2d 707 (1977), and has generally left it to the lower courts to formulate those limitations. The circuits have, for the most part, either limited standing to those "directly injured" or to those "in the target area" of the antitrust violation. See In re Multidistrict Vehicle Air Pollution Litigation M. D. L. No. 31, 481 F.2d 122, 126-28 (9th Cir.), cert. denied, 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336 (1973) (collecting both direct injury and target area cases); Berger & Bernstein, An Analytical Framework for Antitrust Standing, 86 Yale L.J. 809, 813-35 (1977). This Circuit has expressed the standing limitation in terms of "direct injury" and "proximate cause." See Comet Mechanical Contractors, Inc. v. E. A. Cowen Constr., Inc., 609 F.2d 404 (10th Cir. 1980); Farnell v. Albuquerque Publishing Co., 589 F.2d 497 (10th Cir. 1978); Reibert v. Atlantic Richfield Co., 471 F.2d 727 (10th Cir.), cert. denied, 411 U.S. 938, 93 S.Ct. 1900, 36 L.Ed.2d 399 (1973).
 
 
 14
 A price fixing conspiracy is certainly "aimed" at those who purchase the product at the inflated price; their injury is more direct and more proximately caused than those who are unable to purchase due to product scarcity. But a conspiracy to withhold goods from the market may also injure nonpurchasers and we must determine whether a nonpurchaser in Montreal Trading's position should be treated as "directly injured."
 
 
 15
 The two purposes of the treble damage remedy are "to compensate victims of antitrust violations for their injuries" and to deprive violators of "the fruits of their illegality." Illinois Brick, 431 U.S. at 746, 97 S.Ct. at 2075. Here, we note that while nonpurchasers may be considered victims of the conspiracy, the alleged conspirators gained no "fruits" from nonsales except to the extent that sales volume had to decline if they were to succeed in charging inflated prices. Other factors that merit consideration are whether a grant of standing might result in "potentially disastrous recoveries by those only tenuously hurt," Jeffrey v. Southwestern Bell, 518 F.2d 1129, 1131 (5th Cir. 1975), and whether the fact of a party's injury, as opposed to the amount, would be inherently speculative.[1] We find these considerations dispositive. If nonpurchasers who have never dealt with a defendant could recover, a seemingly unlimited number of plaintiffs could assert a virtually unlimited quantity of lost purchases, perhaps exceeding the potential output of the entire industry. With a treble damages entitlement, the result could be multiple recoveries and total damage awards wholly out of proportion with "the fruits of the illegality," easily bankrupting the named defendants. See Illinois Brick, 431 U.S. at 730, 97 S.Ct. at 2067; Mid-West Paper Prods. Co. v. Continental Group, Inc., 596 F.2d 573, 586-87 (3d Cir. 1979).
 
 
 16
 When the nonpurchaser can show a regular course of dealing with the conspirators, injury may not be inherently speculative. Cf. Illinois Brick, 431 U.S. at 733 n.13, 97 S.Ct. at 2068 n.13 (noting that a direct purchaser can claim injury from lost sales due to a price fixing conspiracy). But when, as here, the nonpurchaser has no prior course of dealing with any defendant, we will remain unsure about many things, including: whether the purchase would have been made from one of the conspirators or from one of their competitors; what quantity would have been purchased; what price would have been paid; and at what price resale would have occurred. In the instant case we would also be uncertain whether the potash producers would have inquired about the identity of Montreal Trading's customers before making the sale; whether, if asked, Montreal Trading could have truthfully replied that part of the purchase was allocated to customers outside North Korea; whether Montreal Trading would have had the funds needed to make the purchase; and whether an alleged shortage of railroad cars would have aborted the transaction. Given these problems and uncertainties, and that actual purchasers exist who were more directly injured by the conspiracy and who could be expected to police the conspiracy as "private attorneys general," see Hawaii v. Standard Oil Co., 405 U.S. 251, 262, 92 S.Ct. 885, 891, 31 L.Ed.2d 184 (1972), we believe nonpurchasers should be denied standing to sue, at least when they lack a past course of dealing with the conspirators. Cf. Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 739-49, 95 S.Ct. 1917, 1927-32, 44 L.Ed.2d 539 (1975) (in Rule 10b-5 actions, nonpurchasers are denied standing because of fear of nuisance suits and speculative nature of proving causation); Mid-West Paper Products, 596 F.2d 573 (purchasers from nonconspirators are denied standing to sue the conspirators when their alleged injury is due to nonconspirators raising their prices under a "price umbrella" erected by conspirators).
 
 
 17
 That leaves us with the alleged concerted refusal to sell to Montreal Trading. The usual concerted refusal to deal case is a boycott aimed at suppressing competition from the competitors of the conspirators. See, e. g., Eastern States Retail Lumber Dealers' Ass'n v. United States, 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490 (1914). Montreal Trading's complaint does not fit the usual boycott analysis; the defendants' unwillingness to sell to Montreal Trading appears to be merely a byproduct of production cutbacks. Nothing in the record shows defendants had a special animosity toward Montreal Trading or other commodity traders; nor does the record show defendants intended to harm any particular competitor. If that is so, this case does not involve a concerted refusal to deal, but only a conspiracy to raise prices by restricting production; Montreal Trading was not a special target but only a victim in the same sense as anyone else unable to purchase because of the product scarcity.
 
 
 18
 Nevertheless, we will read Montreal Trading's complaint expansively and treat it as alleging a concerted refusal to sell to Montreal Trading, perhaps singling out Montreal Trading because it had no established purchaser relationship with any of the defendants. In such posture we hold the refusal had insufficient contacts with and effects upon commerce within the United States to justify federal court jurisdiction. Congress did not intend to police every conspiracy in the world involving a conspirator who may be reached by federal court service of process. United States v. Aluminum Co. of America, 148 F.2d 416, 443 (2d Cir. 1945) (Alcoa).
 
 
 19
 The extraterritorial reach of American antitrust laws is limited, first, to acts that affect trade or commerce among the several states or with foreign nations. See sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2. But even if the alleged activity affects interstate or foreign commerce, see Alcoa, 148 F.2d at 443, we must heed comity concerns. The Supreme Court first addressed these concerns in American Banana Co. v. United Fruit Co., 213 U.S. 347, 29 S.Ct. 511, 53 L.Ed. 826 (1909), involving a United States corporation that allegedly convinced the government of Costa Rica to seize the property of its competitor. Justice Holmes, writing for the Court, held there was no cause of action in the United States. He took an extremely territorial approach, declaring that to assume jurisdiction over a case in which all actions occurred outside of our country, "would be an interference with the authority of another sovereign, contrary to the comity of nations, which the other state concerned justly might resent." Id. at 356, 29 S.Ct. at 512.
 
 
 20
 Subsequent cases, while not expressly repudiating the ratio decidendi of American Banana, have severely limited its application. See, e. g., Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962); United States v. Sisal Sales Corp., 274 U.S. 268, 47 S.Ct. 592, 71 L.Ed. 1042 (1927); Alcoa, 148 F.2d 416; Timberlane Lumber Co. v. Bank of America, 549 F.2d 597 (9th Cir. 1976). Nevertheless, the concern for respecting the comity of other nations continues, as evidenced by most of the jurisdictional tests our courts utilize when these international elements are involved.
 
 
 21
 The principal purposes of the antitrust laws are protection of American consumers and American export and investment opportunities. If American interests are at stake we may impose liability for conduct outside our borders that has consequences within our borders. See Alcoa, 148 F.2d at 443. When the contacts with the United States are few, the effects upon American commerce minimal, and the foreign elements overwhelming, however, we do not accept jurisdiction. We believe that the analysis set forth in Timberlane Lumber Co. v. Bank of America, 549 F.2d at 613-15, contains the proper elements for consideration. To support jurisdiction of an American court, plaintiff must first show that the challenged activity had an actual effect on United States commerce. Then we must decide if "the interests of, and links to, the United States including the magnitude of the effect on American foreign commerce are sufficiently strong, vis-Ea-vis those of other nations, to justify an assertion of extraterritorial authority." Id. at 613.
 
 
 22
 Concerning this balancing between United States and extraterritorial contacts and interests, the Restatement (Second) of Foreign Relations Law of the United States § 40 (1965) outlines the following factors as pertinent:
 
 
 23
 (a) vital national interests of each of the states,
 
 
 24
 (b) the extent and the nature of the hardship that inconsistent enforcement actions would impose upon the person,
 
 
 25
 (c) the extent to which the required conduct is to take place in the territory of the other state,
 
 
 26
 (d) the nationality of the person, and
 
 
 27
 (e) the extent to which enforcement by action of either state can reasonably be expected to achieve compliance with the rule prescribed by that state.
 
 
 28
 Kingman Brewster, in formulating a "jurisdictional rule of reason," listed the following factors:
 
 
 29
 (a) the relative significance to the violations charged of conduct within the United States as compared with conduct abroad; (b) the extent to which there is explicit purpose to harm or affect American consumers or Americans' business opportunities; (c) the relative seriousness of effects on the United States compared with those abroad; (d) the nationality or allegiance of the parties or in the case of business associations, their corporate location, and the fairness of applying our law to them; (e) the degree of conflict with foreign laws and policies, and (f) the extent to which conflict can be avoided without serious impairment of the interests of the United States or the foreign country.
 
 
 30
 K. Brewster, Antitrust and American Business Abroad 446 (1958). Although these lists may not be all-inclusive, see Mannington Mills, Inc. v. Congoleum Corp., 595 F.2d 1287, 1297-98 (3d Cir. 1979) (listing a different set of factors), they embody proper factors for consideration.
 
 
 31
 We believe that United States interests are minimal in protecting Montreal Trading from a concerted refusal of Canadian subsidiaries to sell it Canadian potash for delivery in Canada, which it would resell in part or in whole to customers in North Korea. Plaintiff, Montreal Trading, is a one-man company with its office in Montreal. While Montreal Trading argues it was interested in potash wherever produced, and did not limit its requests to Canadian production, the evidence is overwhelming that it sought only Canadian potash and delivery was to take place in Canada. Montreal Trading contacted only firms that had Canadian mines. (R. X, 417, 450-55). Montreal Trading contacted United States offices only after the Canadian operations referred it there as the appropriate business channel. (R. X, 417). In at least one instance a United States company had minesites in both countries, and Montreal Trading specified that it sought Canadian potash. (Pl. Ex. 376.40). Additionally, the owner of Montreal Trading testified that he knew from experience he could not purchase United States products for resale in North Korea. (R. X, 467).
 
 
 32
 The trial court left the jurisdictional question to the jury. It instructed the jury that in order to find a violation of the Sherman Act the jury must find "the refusal to sell Canadian potash to plaintiff has an effect on or was intended to affect the price or supply of potash in the United States." (R. XIV, 1098-99) (emphasis added). If Montreal Trading thought this instruction improperly limited the jury's consideration to the sale of Canadian potash, it should have objected to the instruction at trial. It raised no objection. Although our Court may pass on matters where the proper resolution is beyond a doubt or where a manifest injustice will otherwise result, Singleton v. Wulff, 428 U.S. 106, 121, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976), we are to use our power to consider errors sparingly and in the interests of justice, Prebble v. Brodrick, 535 F.2d 605, 612 (10th Cir. 1976). We have reviewed the documents and testimony, and are of the opinion that there was no manifest injustice here and that the trial court was correct in limiting jurisdictional consideration to the sale of Canadian potash.
 
 
 33
 Montreal Trading has not shown more than a speculative and insubstantial effect on United States commerce of a refusal by Canadian subsidiaries to sell Canadian potash to a Canadian company, at least a part of which was for resale to buyers in North Korea. It is true that the United States imports potash from Canada, and exports its own potash to various countries. We could speculate that a restraint on trade of any commodity this country imports or exports, or even uses, could have some effect on commerce in the United States. But we believe that neither the Constitution nor the Sherman Act was intended to give such far reaching power. The Department of Justice Antitrust Guide for International Operations suggests that we should not take jurisdiction over foreign activities of United States firms "which have no direct or intended effect on United States consumers or export opportunities," for such jurisdiction would be beyond the scope Congress intended, and "could encroach upon the sovereignty of a foreign state without any overriding justification based on legitimate United States interests." Antitrust and Trade Reg. Rep. (BNA) 799-E, at E-3 (1977).
 
 
 34
 Viewing this action as involving only a concerted refusal to deal with Montreal Trading, those acts defendants committed in the United States to restrict production, orchestrated by the Saskatchewan government, are simply not relevant. The only significant American involvement is that Montreal Trading might have resold part of the potash to customers in this country, and that American companies own the Canadian subsidiaries Montreal Trading contacted in its attempt to buy potash. Comity concerns outweigh any effect on United States commerce. Jurisdiction in the courts of the United States would be unjustified.
 
 
 35
 The appeal is therefore DISMISSED.
 
 
 
 [1]
 A party must show with some certainty that it suffered injury as a result of the defendants' actions, but once it shows injury, the amount of damages can be estimated. Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 562-66, 51 S.Ct. 248, 250-52, 75 L.Ed. 544 (1931); see Mid-West Paper Prods. Co. v. Continental Group, Inc., 596 F.2d 573, 584-85 (3d Cir. 1979)