Patrick MAUGEIN, Plaintiff,

v.

NEWMONT MINING CORPORATION, Newmont Second Capital Corporation, Compania de Minas Buenaventura S.A., Compania Minera Condesa S.A., Alberto Benavides de la Quintana, Ronald Cambre, Lawrence T. Kurlander, Guillermo Gulman Checa and Rex Stevenson, Defendants.

No. CIV.A. 02–M–204.

United States District Court, D. Colorado.

Jan. 15, 2004.

Jay S. Horowitz, Horowitz, Wake & Forbes, Denver, CO, for Plaintiff.

Lee D. Foreman, Pamela R. Mackey, Haddon, Morgan, Mueller, Jordan, Mackey & Foreman, PC, Denver, CO, Jeffrey A. Chase, Jacobs, Chase, Frick, Kleinkopf & Kelley LLC, Denver, CO, Neil Peck, John Michael Roche, Jennifer D. Langer, Snell & Wilmer, LLP, Denver, CO, Mark A. Wielga, Erika Zimmer Enger, Temkin, Wielga & Hardt, L.L.P., Denver, CO, for Defendants.

## MEMORANDUM OPINION
## AND ORDER

MATSCH, Senior District Judge.

The factual allegations in the amended complaint, filed July 2, 2002, tell the following story. Patrick Maugein ("Maugein"), a citizen of France who now resides

in London, England, is the "non-executive chairman of SOCO plc, a British oil explorer and producer." He was formerly "the principal of Compagnie Francaise et Internationale de Distribution, a French company involved in international commodities trading." Maugein has been a "successful businessman and has an extensive range of contacts both within France and abroad at the highest levels of government, business and culture."

In 1997, the plaintiff entered into an agreement with Normandy Mining Limited ("Normandy"), an Australian company, to act as consultant and advisor to it and Bureau de Recherches Geologiques et Minieres ("BRGM"), a company in which the French government had an interest, in a dispute with the defendants Newmont Mining Corporation ("Newmont") and Campania de Minas Buenaventura ("Buenaventura") concerning the ownership of a gold mine in Peru, called Minera Yanacocha ("Yanacocha"). The gold deposit had been discovered by BRGM in 1981 and a joint venture among BRGM, Newmont and Buenaventura was formed in 1992 to exploit the mine. As of 1993, ownerships of the mine interests were: 38% by Newmont Second, a subsidiary of Newmont, 24.7% by BRGM through its indirect subsidiary Campagnie Miniere Internationale S.A. ("Mine Or"), 32.3% by Buenaventura through its subsidiary Campania Minera Condesa S.A. ("Condesa"), a defendant, and 5% by IFC, a subsidiary of World Bank.

In November, 1993, France decided to privatize part of BRGM's mining assets. Normandy was selected as the preferred bidder. Accordingly, in September, 1994, a public announcement was made of a proposal for Normandy to acquire 60% of BRGM's interest in subsidiaries owning an interest in Yanacocha. Newmont, Buenaventura and their subsidiaries then sued BRGM, Normandy and their subsidiaries in the Fifth Court of First Instance of Lima, Peru, claiming that the announced proposal triggered preemptive rights held by them to purchase BRGM's subsidiary's 24.7% interest in the mine. In January, 1995, Judge Begue in an *ex parte* proceeding ruled for them on a provisional basis but did not order the actual transfer of the interest. Newmont and Buenaventura appealed to the Eighth Chamber Superior Court and, again proceeding *ex parte*, that court ordered the transfer to them on an interim basis.

BRGM and Buenaventura, through subsidiaries, also held interests in Cedimin, another mining asset in Peru. When BRGM proposed to sell 60% of its interest in that property to Normandy, Buenaventura claimed preemptive rights and BRGM Perou, BRGM's subsidiary, initiated an arbitration proceeding in March, 1995, to counter Buenaventura's court action in which Judge Lopez had entered *ex parte* preliminary orders in favor of Buenaventura.

In June, 1995, Normandy and BRGM entered into a joint venture in which Normandy obtained a 49% interest in BRGM Perou/La Source, BRGM's subsidiary.

The Yanacocha lawsuit went to trial and on September 2, 1996, Judge Begue entered a final order in favor of Newmont and Buenaventura, awarding them all of BRGM's interest upon payment of $109.3 million, the purported value of Mine Or's shares as of November, 1993, the date of the decision to privatize the French assets. That decision was affirmed by the appellate court on February 14, 1997. Normandy and BRGM sought review by the Peruvian Supreme Court.

The agreement with Maugein was made in March, 1997. Maugein served as a member of Normandy's "international advisory council." It was agreed that the

compensation for his services would be 10% of the value of whatever was recovered by Normandy over and above its share of the $109.3 million set by the Peruvian trial court, as well as any additional recovery in connection with Cedimin.

In October, 1997, Maugein wrote a letter to Ronald Cambre, the CEO and president of Newmont, protesting the unfairness of the court decision on behalf of the French government and accusing Newmont of corrupting the courts. Cambre replied with a denial letter dated October 6, 1997, to which the plaintiff wrote a response that he would not be intimidated.

On January 5, 1998, the Supreme Court of Peru by a 3 to 2 split decision ruled favorably for Normandy and BRGM. Because Peruvian law required the assent of 4 judges, a sixth judge was appointed and a 3 to 3 tie decision entered on May 8, 1998, requiring the appointment of a seventh judge on May 18, 1998. The seventh judge ruled favorably to Newmont and Buenaventura on June 3, 1998.

In September of that year, at Maugein's urging, BRGM Perou and Mine Or brought "charges" before the International Centre for Settlement of Investment Disputes ("ICSID"), a forum sponsored by the World Bank, alleging corruption of the judicial system of Peru.

In January, 1999, the Peruvian Supreme Court refused review of the Cedimin decision and in July, 1999, the Cedimin arbitrator ruled against BRGM but did not fix a price to be paid for the interest at issue.

In December, 2000, Newmont, Buenaventura, Normandy and BRGM entered into a settlement agreement resolving their disputes and discontinuing the ICSID proceeding against the Republic of Peru. As part of that agreement, Normandy expressly agreed not to assist or support Maugein in any of his claims.

The litigation and arbitration proceedings in Peru were during the administration of President Fugimori. The former head of the Peruvian intelligence service Vladimiro Lenin Montesinos Torres was paid by the defendants to bribe the Peruvian judges and to discredit Maugein. Maugein and the French government were accused of a bribery and extortion plot to obtain favorable results in the court proceedings. Additionally, the defendants recruited a French "investigative journalist" to defame and discredit Maugein in a Peruvian magazine article and a book distributed in the United States. That effort continued after the settlement agreement with additional false articles and another book.

Maugein seeks to invoke the Federal question jurisdiction of this court provided by 28 U.S.C. § 1331 to recover for the loss of his property interest in the mining assets in Peru and injury to his business interests and reputation resulting from the defendants' orchestration of the described events. He asks for damages of at least $25 million as the value of the lost property and injuries on claims of violations of RICO, 18 U.S.C. §§ 1962(b), (c) and (d), and the Alien Tort Claims Act, 28 U.S.C. § 1350.

The defendants have moved to dismiss these claims under Fed.R.Civ.P. 12(b)(1) and (6) for lack of subject matter jurisdiction and failure to allege sufficient factual support for the claimed statutory violations. The defendants deny many of the allegations made by the plaintiff but they must be accepted as true in ruling on these motions. Oral argument was heard on September 11, 2003.

The challenge to subject matter jurisdiction is interwoven with the asserted insufficiency of the statement of the claims. It is also based, in part, on the contention that RICO has no extraterritorial applica-

tion and the principles of comity and *forum non conveniens* requiring deference to the courts of Peru as they now exist.

■ The civil remedies for RICO criminal conduct in 18 U.S.C. § 1964(a) and (c), read with the venue provisions in 18 U.S.C. § 1965, facially support the plaintiff's view that both the Colorado resident defendants and foreign citizens and entities may be subject to suit here. Because the statute does not expressly provide for extension to controversies that concern conduct in foreign countries, the question is whether Congress intended to reach into the internal affairs of another nation by criminalizing and punishing activity of the type alleged in the amended complaint. As the Second Circuit Court of Appeals observed in *North South Finance Corp. v. Al–Turki,* 100 F.3d 1046, 1052 (2nd Cir. 1996), the civil action provision of RICO was patterned after the Clayton Act providing civil remedies for violations of the Sherman Act. Accordingly, the cases deciding questions of extraterritorial application of the antitrust laws give good guidance.

The Tenth Circuit Court of Appeals determined that there was no jurisdiction to adjudicate a concerted refusal to deal complaint by a Canadian company seeking to purchase Canadian potash from Canadian subsidiaries of U.S. producers for delivery in Canada and re-sale in North Korea in *Montreal Trading Ltd. v. Amax Inc.,* 661 F.2d 864 (10th Cir.1981). The reach of antitrust law to conduct occurring beyond this country's borders was held to be dependent upon a showing that American interests are at stake because of contacts with and effects on commerce internally and export and investment opportunities. This court followed that guidance in dismissing a class action complaint in *Rivendell Forest Prods., Ltd., v. Canadian Forest Prods., Ltd.,* 810 F.Supp. 1116 (D.Colo.

1993). What effects within the United States are shown must be balanced against the interests of the other nation involved.

In this case, the internal interests of preventing an American company and its officers from retaining the benefits of a conspiracy affecting the judicial processes of a foreign government and the exploitation of the mineral resources of that country are heavily outweighed by the interests of the Republic of Peru. The factual allegations of fraud, bribery, extortion and corruption involve actions and actors at high levels of the Fujimori regime which has been the subject of both national and international investigation and criminal charges.

The defendants in this case include two Peruvian corporations, two citizens of Peru and a citizen of Australia. It is doubtful that those defendants are subject to personal jurisdiction in this court and they appear to be necessary parties.

To prove his claims, Maugein must demonstrate the invalidity of the ruling of the highest court in Peru and the decision of an arbitrator. That, in itself, would not establish a basis for recovery because the parties involved in those proceedings entered into a settlement agreement resolving the dispute that was the subject of those proceedings in Peru. The plaintiff did not participate in that settlement. There is, therefore, no basis for his claiming any part of the $80 million paid to BRGM and Normandy. The premise of Maugein's claim for damages from his exclusion from the negotiations leading to the settlement agreement is that he could have obtained a better result for those parties, French and Australian companies.

Discovery and proof of that contention would require access to records and testimony from persons and entities who are not parties in this proceeding and who are

not subject to the processes of this court. The defendants have sought dismissal based on the doctrine of *forum non-conveniens,* contending that Maugein can obtain relief in Peru. They have presented papers supporting that position and the plaintiff has made a contrary showing. That question need not be resolved here. Dismissal of this action does not depend upon finding that the plaintiff has an adequate forum elsewhere. The question is whether this court provides that forum and the conclusion is that it does not for the reasons discussed above.

If jurisdiction is assumed, the defendants' motions to dismiss challenge the sufficiency of the factual allegations of the amended complaint to state claims under the cited statutes.

■ All three of the RICO claims depend upon a showing that Maugein sustained an injury "in his business or property by reason of a violation of section 1962" to have standing to bring an action under 18 U.S.C. § 1964(c). *Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992). The plaintiff's pleading is deficient in two respects. First, he has not described a recognizable business or property interest and second, he has not shown that the defendants' conduct could be considered a proximate cause of any presumed injury. Maugein asserts that he had a vested interest in Yanacocha by reason of his agreement with Normandy. From the papers filed in this case, it is difficult to determine what legal formation is meant by Yanacocha. It is described as a "gold mine," a "gold deposit," "shares," a Peruvian partnership, and a Peruvian company. The parties have referred to "by-laws" and a joint venture. The participation percentages referred to as ownership or equity interests involved in the Peruvian litigation were held indirectly by the parties through a confusing complex of intermediate entities. In short, the plaintiff has failed to articulate any property owned by him. At best, he has alleged an expectancy to have an opportunity to obtain some form of property for Normandy and BRGM which Normandy would share with him.

■ Apart from whatever Maugein might have obtained by his efforts in the Yanacocha and Cedimin disputes, Maugein says that his reputation has been damaged by the defamatory and derogatory stories about him circulated by the defendants and their accomplices. To be actionable under RICO, such conduct must injure him in his ability to carry on some type of activity that can be characterized as business. Impugning character and damage to personal reputation are not enough. The plaintiff's allegations about his contacts and relationships to business do not describe any activity that can be recognized as business.

In addition to the requirement that there be some identifiable business or property injury, the plaintiff must allege some consequences resulting from the defendants' criminal conduct. The phrase "by reason of" has been interpreted to mean caused by in the sense of proximate cause in the common law of torts in the United States. *Holmes, supra; Laborers Loc. 17 Health & Ben. Fund v. Philip Morris, Inc.,* 191 F.3d 229 (2nd Cir.1999). Nothing in the amended complaint meets that requirement.

Because the amended complaint does not sufficiently allege the requirements for a civil proceeding under RICO, it is not necessary to discuss the issues concerning the adequacy of the predicate acts allegations put in issue by the defendants' pleadings.

██ Maugein's other federal claim is for damages under the Alien Tort Claims Act, 28 U.S.C. § 1350, which provides that:

The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States.

The plaintiff contends that the defendants' conduct violated (1) the OECD Convention (treaty)[1] prohibiting bribery in international transactions as recognized in the Foreign Fair Practices Act; (2) the Universal Declaration of Human Rights, requiring a fair, impartial and independent tribunal; (3) the International Convention on Civil and Political Rights treaty requiring such a tribunal; (4) the Inter–American Convention Against Corruption; and (5) the law of nations.

██ The complexity involved in the application of this cryptic statute in the context of a globalized economy and evolving international organizations is evident from the scholarly opinion of Judge Cabranes of the Second Circuit Court of Appeals, deciding *Flores v. Southern Peru Copper Corp.,* 343 F.3d 140 (2nd Cir.2003). Courts have reached differing conclusions as to the requirements for a treaty to provide a private remedy in tort. Some have drawn a distinction between those treaties that are "self-executing" and those that require implementing domestic legislation. *E.g., Jama v. U.S. I.N.S.,* 22 F.Supp.2d 353, 362 (D.N.J.1998). What constitutes tortious conduct under the "law of nations" is even less clear. It is not necessary to clear a path through this thicket to decide that Maugein's claim is insufficient. The corruption of the adjudicatory processes employed in the mine ownership disputes in Peru was not the proximate cause of his claimed injuries and losses. His economic interests, however characterized, were not the target of that conduct. Defamation of the plaintiff's personal character and reputation is a tort under American law and, presumably, the domestic law of many other nations. It is not, however, a subject of the proscriptions of the law of nations or any of the treaties and sources of international law cited in this case.

Because the amended complaint does not state a claim for relief within the subject matter jurisdiction of this court, it is not necessary to determine the motions to dismiss for lack of personal jurisdiction filed by non-resident defendants.

For the foregoing reasons, the defendants' motions to dismiss for lack of subject matter jurisdiction and failure to state any claim for relief are granted.

For the reasons stated at the hearing on September 11, 2003, the court declines to exercise supplemental jurisdiction over the state law claims. It is

ORDERED that this civil action is dismissed.

---

1. The Organization for Economic Cooperation and Development's Convention on Combating Bribery of Foreign Public Officials in International Business Transactions.