11-1111-cv
Gatt Commc'ns, Inc. v. PMC Associates, L.L.C.

# United States Court of Appeals
## FOR THE SECOND CIRCUIT

August Term, 2011

(Argued: February 6, 2012     Decided: February 14, 2013)

Docket No. 11-1111-cv

GATT COMMUNICATIONS, INC.,

*Plaintiff-Appellant,*

—v.—

PMC ASSOCIATES, L.L.C., DBA PMC ASSOCIATES,
PMC ASSOCIATES, INC., DBA PMC ASSOCIATES,
PHILLIP M. CASCIANO ASSOCIATES, INC., DBA PMC ASSOCIATES,
PHILLIP M. CASCIANO, BRYAN CASCIANO,
THOMAS WINELAND, VESEL RADIVIC,

*Defendants-Appellees,*

JOHN DOE, HENRY HOE, RICHARD ROE,

*Defendants.*

Before:
     WESLEY, CARNEY, *Circuit Judges*, and CEDARBAUM, *District Judge.*[*]

     Appeal from a final judgment of the United States District Court for the Southern District of New York (Deborah A. Batts, *Judge*), granting Defendants-Appellees' motions to dismiss the amended complaint. We conclude that Plaintiff-Appellant Gatt Communications, Inc., lacks antitrust standing to bring its claims

---

[*] The Honorable Miriam Goldman Cedarbaum, United States District Judge for the Southern District of New York, sitting by designation.

under the Sherman Act and the Donnelly Act.  We also hold that Gatt's common law claims were properly dismissed as a matter of law.

AFFIRMED.

_____

KAREN F. NEUWIRTH, Law Office of Martin S. Rapaport, New York, New York, *for Plaintiff-Appellant Gatt Communications, Inc.*

MICHAEL J. HAHN (Kristin A. Muir, *on the brief*), Lowenstein Sandler PC, New York, New York, *for Defendants-Appellees Philip M. Casciano Associates, Inc. DBA PMC Associates, Philip Casciano, Bryan Casciano, and Vesel Ramovic.*[1]

DANIEL E. LAYTIN, Kirkland & Ellis LLP, Chicago, Illinois (Jay P. Lefkowitz, Lauren O. Casazza, Kirkland & Ellis LLP, Jay B. Spievack, Kara L. Gorycki, Cohen Tauber Spievack & Wagner P.C., New York, New York, *on the brief*), *for Defendant-Appellee Thomas Wineland.*

_____

SUSAN L. CARNEY, *Circuit Judge*:

This case involves an alleged bid-rigging scheme that sought to defraud various New York State and City government agencies in connection with the purchase by those agencies of a particular brand of mobile radio.  Plaintiff-Appellant Gatt Communications, Inc. ("Gatt"), an admitted past participant in the purported scheme, seeks to recover damages from alleged co-conspirators for losses arising from the termination of Gatt's at-will distribution contract for those radios.  Gatt's federal and state antitrust claims arise under the Sherman Act, 15 U.S.C. § 1, and the Donnelly Act, N.Y. Gen. Bus. Law § 340; its other claims sound in New York

---

[1] In the text of our opinion, we use spellings of these defendants' names that appear from their filings to be correct.  In the caption of our opinion, however, in accordance with Fed. R. App. P. 12(a), we use spellings that conform to those appearing in the title of the district court action.

2

common law. The district court (Deborah A. Batts, *Judge*) dismissed the complaint for failure to state a claim. <u>Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.</u>, No. 10 Civ. 8, 2011 WL 1044898 (S.D.N.Y. Mar. 10, 2011). We conclude that Gatt lacks antitrust standing to pursue its antitrust claims and that its common law claims were properly dismissed as a matter of law. We therefore AFFIRM the district court's dismissal of Gatt's complaint.

## BACKGROUND

As alleged in Gatt's amended complaint and the affidavit of Pietro Gattini, Gatt's owner and president, the relevant facts are as follows.[2]

### A. Factual Background

Gatt buys, markets, and sells commercial land mobile radios in New York State. Vertex Standard USA, Inc. ("Vertex"), which is not a party to this action, manufactures and distributes the radios that are the subject of this dispute, and from 2005 through 2008, Defendant-Appellee Thomas Wineland worked for Vertex as its Vice President of Sales and Marketing. Defendant-Appellee PMC Associates, Inc. ("PMC") is both a dealer of Vertex products and Vertex's sales

---

[2] Gatt submitted the affidavit of Pietro Gattini as an attachment to its opposition to defendants' motions to dismiss. The affidavit largely mirrored the factual assertions presented in the amended complaint, but also contained additional allegations. The district court treated the affidavit as outside the pleadings and excluded it from consideration on the motions to dismiss. <u>See</u> Fed. R. Civ. P. 12(d). Gatt argues that the court erred by failing to consider the Gattini affidavit. We express no opinion about whether the district court should have considered the affidavit. Instead, we treat the allegations as if they had been included in a second amended complaint, and conclude for the reasons set forth in the text that even as so amplified, Gatt has failed to state a claim upon which relief can be granted.

3

representative in New York State.[3]

In May 2002, Gatt and Vertex entered into an agreement (the "Dealer Agreement" or the "Agreement") pursuant to which Gatt became a licensed dealer of Vertex radios and equipment. The Dealer Agreement was subject to termination by either party without cause on thirty days' written notice.[4] In connection with the Agreement, Vertex advised Gatt that PMC, as Vertex's sales representative in New York, would orchestrate and support Gatt's efforts to sell Vertex products. Vertex instructed Gatt to follow PMC's directions and "to keep PMC closely informed of all of Gatt's sales efforts and progress in contacting, cultivating, developing and . . . selling Vertex branded radios" to potential customers. Am. Compl. ¶¶ 36-37. Vertex explicitly warned Gatt that failure to cooperate with PMC could result in termination of the Dealer Agreement.

Between 2002 and 2007, various New York City and State government agencies purchased significant quantities of Vertex radios for security and other communication purposes. These agencies often made their purchases by soliciting

[3] Our references to "PMC" include, collectively, corporate defendants-appellees PMC Associates, Inc., PMC Associates, LLC, Philip M. Casciano Associates, Inc., and individual defendants-appellees Philip M. Casciano, Bryan Casciano, and Vesel Ramovic. Gatt alleges that Philip and Bryan Casciano are principals and senior officers of PMC and Vesel Ramovic is an employee of PMC.

[4] Although the record does not contain the entire Dealer Agreement, Vertex's October 22, 2007 notice of termination quotes language from the Dealer Agreement authorizing "without cause" termination by either party. Ex. 15 to Gattini Aff. Because the amended complaint refers to this termination letter, see Am. Compl. ¶ 139, we may consider the letter in reviewing the district court's dismissal of this action, see Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000). The pertinent terms of the Dealer Agreement are undisputed: Gatt concedes that the Dealer Agreement authorized Vertex to terminate Gatt's license at any time without cause. Appellant's Br. at 24, 45.

bids from Vertex dealers. In December 2006, PMC and New York State's Procurement Services Group entered into a contract (the "New York Catalog Contract") that "set the price at which any [New York government] agency could buy each particular Vertex radio model if such agency did not want to conduct a bidding process." Am. Compl. ¶ 49-50. The New York Catalog Contract thus set a maximum price for Vertex products, but left state agencies free to solicit bids from Vertex dealers with the aim of securing a lower price. PMC, however, forbade Vertex dealers from selling to government agencies at prices below those listed in the New York Catalog Contract. At least six Vertex dealers in addition to Gatt and PMC had both Vertex's contractual permission and the practical wherewithal to submit (and fulfill) bids in response to solicitations by local agencies.

Gatt alleges that PMC and Wineland (acting for Vertex) orchestrated a "bid-rigging" or "bid rotation" scheme between at least 2005 and 2007. The plan called for PMC to determine in advance which Vertex dealer would submit the lowest (and, they reasonably expected, winning) bid for each government contract involving the purchase and sale of Vertex products. At PMC's direction, the designated Vertex dealer would then submit a bid at a price set by PMC. The remaining dealers either would refrain from bidding or submit artificially inflated "dummy quotations" for the contract. The alleged scheme thus maintained the superficial appearance of a competitive bidding process, while ensuring the outcome desired by PMC and Vertex. If a Vertex dealer did not comply with the sham bidding process, however, PMC "could and would cause" Vertex to terminate that

5

dealer's license. Id. ¶ 53. Gatt alleges that Vertex knew that PMC was "organizing, arranging and orchestrating quotations" and "supported and encouraged such unlawful activity." Id. ¶¶ 156.

Gatt admits that it participated in the scheme at least from September 2005 to May 2007. On at least five occasions in that period, Gatt submitted artificially-inflated bids to various New York government agencies at PMC's request, thereby helping to steer contracts to the predetermined bid-winning Vertex dealer, which—as it happened—was usually PMC itself. In addition, in April 2007, PMC convinced Gatt to refrain from bidding on a particular government contract by promising that once the contract had been awarded to PMC, PMC would hire Gatt as the principal subcontractor on the project. Gatt alleges that it went along with the scheme out of fear that its Vertex dealership license would otherwise be terminated.

Gatt profited from the scheme. Indeed, Gatt estimates that it was "one of the most productive Vertex dealers in the United States" by volume of sales. Id. ¶ 35. It acknowledges obtaining more than one hundred contracts because of the collusive bidding scheme. Gattini Aff. ¶ 28. For instance, Gatt often responded to bid solicitations from the New York City Department of Education, which required a minimum of three bidders before it would award a contract. Each time Gatt intended to bid on a Department of Education contract, it first faxed a copy of its bid to PMC, and PMC arranged for other Vertex dealers to submit sham, higher bids, all but guaranteeing that Gatt would be awarded the contract if the Department chose

6

to purchase Vertex radios.[5]

Although Gatt actively participated in and benefited from the scheme for at least two years, by the fall of 2007, it had begun to feel that PMC had "abused" its relationship with Gatt. Am. Compl. ¶ 123. Gatt had also become frustrated with the share of government contracts allocated to it under the scheme, especially by comparison with the higher-value contracts that PMC kept for itself. See Gattini Aff. ¶ 79 ("Gatt won some contracts under the [bid-rigging] scheme[, but] all the big contracts were being taken by PMC and [Gatt] wanted . . . to become a significant business."). Accordingly, in August 2007, when the New York City Transit Authority requested bids for the purchase of 1,200 Vertex radios and related equipment—a contract worth in excess of $1 million in revenues to the successful bidder—Gatt broke ranks and independently set and submitted a quotation, despite PMC's instruction to the contrary. In September 2007, the Transit Authority informed Gatt that it was the lowest bidder and likely would win the contract.

When PMC learned of Gatt's rogue bid, however, it reported to Wineland that Gatt was a "troublemaker" and recommended that Vertex terminate Gatt's Dealer Agreement. Am. Compl. ¶ 128-129. PMC also offered Gatt $40,000 to withdraw its Transit Authority bid. When Gatt complained to Wineland about

---

[5] Although Gatt has alleged that defendants engaged in anticompetitive acts in connection with the sale of Vertex radios, it has not alleged that Vertex is the sole manufacturer of commercial land mobile radios. Thus, consumers were presumably free to purchase other brands of radios. As the district court recognized, this observation alone could be fatal to Gatt's claim if we were to reach the merits and apply a "rule of reason" analysis, because Gatt has failed to allege that competition was improperly restrained in the market for commercial land mobile radios generally. Gatt Commc'ns, 2011 WL 1044898, at *3. Because we conclude that Gatt lacks antitrust standing, however, we need not reach this issue.

7

PMC's conduct, Wineland advised Gatt to accept PMC's $40,000 offer, advice that Gatt rejected.

Gatt soon received a letter from Wineland dated October 22, 2007, giving notice that Vertex had exercised its "option" to terminate Gatt's Vertex dealership, effective thirty days later. On October 30, 2007, the Transit Authority sought new bids for the contract after realizing that its original bid request contained technical errors. No longer authorized to sell Vertex products, Gatt could not rebid. PMC eventually won the contract.

B.    Procedural History

In January 2010, Gatt filed this action against PMC and others (but not Vertex) in the United States District Court for the Southern District of New York. In its amended complaint, Gatt sought damages for defendants' alleged violations, through the bid-rigging scheme, of the Sherman Act, 15 U.S.C. § 1; the Donnelly Act, N.Y. Gen. Bus. Law § 340; and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.* The amended complaint also asserted New York common law claims for tortious interference with contract and tortious interference with prospective business relations.

For each of its three antitrust causes of action, Gatt sought principally $1.2 million in damages, to be trebled; for each of its two state common law counts, Gatt sought $1.16 million, plus punitive damages in an unspecified amount. Its alleged injuries were based in part on commissions lost on two contracts it assertedly would have won in the absence of the scheme—the $1 million Transit Authority

8

contract and a $250,000 contract involving the 2007 sale of Vertex radios to the School Safety Division of the New York City Police Department.[6] It also sought to recover for lost profits associated with unspecified future contracts for the sale of Vertex radios.

Upon motions filed by PMC and Wineland, the district court dismissed the amended complaint and granted judgment for the defendants. Applying the rule of reason to Gatt's antitrust claims, the district court concluded that those claims were insufficiently pleaded because Gatt had identified neither a relevant product market nor an adverse effect on competition in *any* market. With regard to Gatt's state tort claims, the district court held that Gatt had failed to state a claim for tortious interference with contract or for tortious interference with prospective business relations. It reasoned principally that Gatt's complaint alleged no breach of the Dealer Agreement and failed to allege facts sufficient to support a theory that PMC's sole purpose in informing Vertex of Gatt's bid on the Transit Authority contract was to harm Gatt.[7] The court denied Gatt leave to replead, concluding that additional amendment of the complaint would be futile because Gatt could not "allege an injury to itself that corresponds to the rationale for finding a violation of the antitrust laws in the first place," and because the facts pleaded in support of the

---

[6] Gatt maintains that after it disclosed its proposed quotation for the Police Department contract to PMC, PMC wrongfully used that information to underbid Gatt. The Police Department awarded the contract to PMC in March 2007.

[7] The court also held that Gatt lacked standing to pursue its RICO claims, a ruling that Gatt does not challenge on appeal. See Appellant's Br. at 4 n.1.

9

common law claims were "incompatible" with Gatt's legal theories. <u>Gatt</u>, 2011 WL 1044898, at *7-8 (internal quotation marks omitted).

Gatt now appeals.

## DISCUSSION

We review *de novo* a district court's dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6), "construing the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." <u>Chase Grp. Alliance LLC v. City of N.Y. Dep't of Fin.</u>, 620 F.3d 146, 150 (2d Cir. 2010) (internal quotation marks omitted). To survive a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)). A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Id.</u>

The district court's dismissal of the antitrust claims was premised principally on the shortcomings in plaintiff's § 1 allegations, and, on appeal, Gatt contends principally that the district court erred in applying a rule of reason analysis to Gatt's antitrust claims, arguing that the bid-rigging alleged in the complaint is *per se* unlawful under § 1 of the Sherman Act.[8] Denying leave to

---

[8] The "rule of reason" is the standard used to assess whether restraints on trade that are not unlawful *per se* nonetheless violate § 1 of the Sherman Act. <u>Leegin Creative Leather Prods., Inc. v. PSKS, Inc.</u>, 551 U.S. 877, 885-86 (2007). When applying the rule of reason, courts weigh all of the

replead, the district court questioned Gatt's antitrust standing to pursue its claims in any event. On review, we focus on this threshold question of antitrust standing, because we may affirm, of course, "on any ground which finds support in the record, regardless of the ground upon which the trial court relied." Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc., 448 F.3d 573, 580 (2d Cir. 2006) (internal quotation marks omitted).

A.    Antitrust Standing

Section 4 of the Clayton Act establishes a private right of action for violations of the federal antitrust laws, and entitles "[a]ny person who [is] injured in his business or property by reason of anything forbidden in the antitrust laws" to treble damages for those injuries. 15 U.S.C. § 15. As the Supreme Court explained in its seminal decision addressing § 4 actions, however, "Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." Associated General Contractors of Cal., Inc. v. California State Council of Carpenters ("Associated General Contractors"), 459 U.S. 519, 534 (1983) (internal quotation marks omitted). Absent such boundaries, the potent private enforcement tool that is an action for treble damages could be invoked without service to—and potentially in disservice of—the purpose of the antitrust laws: to protect competition.

---

circumstances surrounding the challenged acts to determine whether the alleged restraint is unreasonable, taking into account factors such as "specific information about the relevant business," "the restraint's history, nature, and effect," and "[w]hether the businesses involved have market power." Id. (internal quotation marks omitted).

The right to pursue private actions for treble damages under § 4 has thus developed limiting contours over the thirty years since Associated General Contractors was handed down. Those contours are embodied in the concept of "antitrust standing." Daniel v. American Bd. of Emergency Med., 428 F.3d 408, 436-38 (2d Cir. 2005). "[A]ntitrust standing is a threshold, pleading-stage inquiry and when a complaint by its terms fails to establish this requirement we must dismiss it as a matter of law." NicSand, Inc. v. 3M Co., 507 F.3d 442, 450 (6th Cir. 2007) (en banc). See, e.g., Port Dock & Stone Corp. v. Oldcastle Ne., Inc., 507 F.3d 117, 121, 126-27 (2d Cir. 2007) (dismissing § 4 claim for want of antitrust standing); Paycom Billing Servs., Inc. v. MasterCard Int'l, Inc., 467 F.3d 283, 290-95 (2d Cir. 2006) (same); Daniel, 428 F.3d at 438-41 (same). The doctrine of antitrust standing prevents private plaintiffs from "recover[ing] damages under § 4 . . . merely by showing injury causally linked to an illegal presence in the market." Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 334 (1990) (internal quotation marks omitted).

To determine whether a private plaintiff has antitrust standing, we consider the following factors, identified by the Supreme Court in Associated General Contractors: whether the plaintiff's alleged injury "is of the type that the antitrust statute was intended to forestall," 459 U.S. at 540; "the directness or indirectness of the asserted injury," id.; the extent to which the plaintiff's asserted damages are speculative, id. at 542; "the potential for duplicative recovery or complex apportionment of damages," id. at 545; and "the existence of more direct

12

victims of the alleged conspiracy," id.  Applying Associated General Contractors, our Court has distilled these factors into two imperatives:  we require a private antitrust plaintiff plausibly to allege (a) that it suffered "a special kind of 'antitrust injury,'" and (b) that it is a suitable plaintiff to pursue the alleged antitrust violations and thus is an "efficient enforcer" of the antitrust laws.  Port Dock, 507 F.3d at 121-22; see also Daniel, 428 F.3d at 436-38, 443-44.  We discuss both below.

1.  Antitrust Injury

The requirement that plaintiffs demonstrate antitrust injury when bringing a private antitrust action "ensures that the harm claimed by the plaintiff corresponds to the rationale for finding a violation of the antitrust laws in the first place."  Atlantic Richfield, 495 U.S. at 342.

We employ a three-step process for determining whether a plaintiff has sufficiently alleged antitrust injury.  First, the party asserting that it has been injured by an illegal anticompetitive practice must "identify[ ] the practice complained of and the reasons such a practice is or might be anticompetitive."  Port Dock, 507 F.3d at 122.[9]  Next, we identify the "actual injury the plaintiff alleges." Id.  This requires us to look to the ways in which the plaintiff claims it is in a "worse position" as a consequence of the defendant's conduct.  Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 486 (1977).  Finally, we "compar[e]" the

---

[9] The conditional phrasing of this step of the analysis hints at its difficulty.  When assessing antitrust injury, we assume that the practice at issue is a violation of the antitrust laws, see Daniel, 428 F.3d at 437, and are, thus, in the difficult position of positing a rationale for the antitrust laws' prohibition of conduct that may, in fact, not be prohibited.

13

"anticompetitive effect of the specific practice at issue" to "the actual injury the plaintiff alleges." Port Dock, 507 F.3d at 122. It is not enough for the actual injury to be "causally linked" to the asserted violation. Brunswick, 429 U.S. at 489. Rather, in order to establish antitrust injury, the plaintiff must demonstrate that its injury is "of the type the antitrust laws were intended to prevent and that flows from that which makes [or might make] defendants' acts unlawful." Daniel, 428 F.3d at 438 (internal quotation marks omitted).

Because Gatt's dealership agreement with Vertex was terminable without cause, Gatt cannot assert that the mere termination of its dealership, without more, constitutes an antitrust violation. Perhaps for that reason, Gatt alleges that PMC's conduct in recommending that Vertex terminate its contract with Gatt, and Wineland's involvement in that termination, violated the antitrust laws because that conduct was intended to perpetuate an illegal and anticompetitive bid-rigging scheme.[10] In other words, the illegal "practice" Gatt alleges is the carrying out of an illegal bid-rigging scheme, and Gatt's alleged injury is the harm it suffered as a consequence of its inability to continue selling Vertex products. This harm only supports antitrust injury, however, if it flows from that which makes the bid-rigging scheme unlawful.

---

[10] We note preliminarily that Vertex is nowhere to be seen on the stage of this litigation other than through the cameo appearance of defendant Vineland. Vertex's absence as a defendant–despite its ostensibly key role in manipulating the bid-rigging process–signals at least faintly that a purpose other than vindication of competition in an open market may be the true goal of this litigation. Even without assigning any substantive meaning to Vertex's absence, however, we easily find an absence of antitrust injury sufficient to permit Gatt to claim standing in this suit.

As an initial matter, it is not clear that the underlying bid-rigging arrangement alleged here is prohibited by the antitrust laws. Gatt has alleged a conspiracy involving only one brand of commercial land mobile radios and has not pleaded that the brand constitutes a stand-alone market. Although intra-brand bid-rigging such as Gatt alleges may well violate New York State procurement law—a subject on which we express no opinion here—inhibitions on intrabrand competition actuated by dealership terminations lie far from the core § 1 violations that are likely to give rise to antitrust injury. As we explained in K.M.B. Warehouse Distributors, Inc. v. Walker Manufacturing Co., 61 F.3d 123, 127-28 (2d Cir. 1995), "[r]estrictions on intrabrand competition can actually enhance market-wide competition by fostering vertical efficiency and maintaining the desired quality of a product." See id. at 128 ("The only clear effect of defendants' alleged conspiracy was to prevent [the plaintiff] from carrying products . . . [of one of the defendants].").

But even assuming that the alleged bid-rigging scheme is unlawful, it is so only because of the harm it may cause—increased prices—to purchasers of Vertex products. See Balaklaw v. Lovell, 14 F.3d 793, 797 (2d Cir. 1994). Gatt's lost revenue resulting from the Vertex termination, however, is not an injury that flows from that which makes bid-rigging unlawful. Gatt has not been forced to pay higher prices for a product, as customers who are victimized by price-fixing schemes might. Instead, Gatt's injuries flow from its participation and then exclusion from a distribution network that, allegedly, featured intra-brand price-fixing, and in which it had no right *ab initio* to participate. Even if the antitrust laws seek to prevent

15

Vertex and PMC's alleged activities because of resulting harms to *competition*, these laws are not concerned with injuries to *competitors* such as Gatt resulting from their participation in or exile from such schemes. See Atlantic Richfield, 495 U.S. at 338.

Gatt points to no persuasive authority to support its argument that it has suffered antitrust injury. Leegin Creative Leather Products, Inc. v. PSKS, Inc., 551 U.S. 877 (2007), cited by Gatt, does not turn on or even discuss antitrust standing, and Jack Kahn Music Co. v. Baldwin Piano & Organ Co., No. 78 Civ. 3295, 1978 WL 1449 (S.D.N.Y. Dec. 6, 1978), also relied on by Gatt, was reversed by our court, 604 F.2d 755 (2d Cir. 1979). Eiberger v. Sony Corp. of America, 622 F.2d 1068 (2d Cir. 1980), involved a suit by a former dealer against a manufacturer who was alleged both to have engaged in anti-competitive practices and to have terminated the plaintiff's dealership for failure to comply with those practices. On appeal after trial, we did not address antitrust standing. The decision simply does not establish that Gatt has suffered antitrust injury under the circumstances presented here.

In sum, Gatt's allegations fail to demonstrate injury "of the type the antitrust laws were intended to prevent and that flows from that which makes [the] defendants' acts unlawful." Brunswick, 429 U.S. at 489. Therefore, Gatt does not have antitrust standing to pursue these claims.

### 2. The "efficient enforcer" component of antitrust standing

Even were we to conclude that Gatt had demonstrated antitrust injury, however, it is plain that Gatt is not an "efficient enforcer" of the antitrust laws and therefore lacks antitrust standing on that basis as well. See, e.g., Daniel, 428 F.3d

16

at 443 ("A showing of antitrust injury is necessary, but not always sufficient, to establish [antitrust] standing." (internal quotation marks omitted)).

To determine whether a putative antitrust plaintiff is an "efficient enforcer" of the antitrust laws, we examine primarily the following factors:

> (1) the directness or indirectness of the asserted injury;
> (2) the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement; (3) the speculativeness of the alleged injury; and (4) the difficulty of identifying damages and apportioning them among direct and indirect victims so as to avoid duplicative recoveries.

Paycom, 467 F.3d at 290-91 (internal quotation marks omitted). The importance assigned to these factors "will necessarily vary with the circumstances of particular cases." Daniel, 428 F.3d at 443. Reviewing those factors here, we conclude that Gatt fails utterly to show that it is an "efficient enforcer": the injuries that it alleges are only indirectly related to the primary violation asserted; other potential plaintiffs are in a better position to vindicate the public interest at issue; Gatt's damages are speculative at best; and were Gatt permitted to pursue this action, we can expect that other participants in (and allegedly, "victims" of) the scheme would likewise seek treble damages for contracts and commissions that they speculate they, too, might have lost pursuant to the alleged bid-rigging scheme.

i. Indirect injury

Gatt's purported injuries are at best an indirect result of the primary asserted antitrust violation: price-fixing through bid-rigging, as perpetuated by

17

termination of the Dealer Agreement. "Directness in the antitrust context means close in the chain of causation." International Bus. Machs. Corp. v. Platform Solutions, Inc., 658 F. Supp. 2d 603, 611 (S.D.N.Y. 2009) (internal quotation marks omitted); see also Associated General Contractors, 459 U.S. at 540-41. Although defendants' alleged conduct may have harmed Gatt by denying Gatt commissions it might otherwise have earned had its Dealer Agreement remained in force, the amount and number of those lost commissions are far more remote and conjectural than the losses suffered by the government agencies. Gatt was only incidentally harmed by the conspiracy, as noted above. It did not pay higher prices by virtue of the conspiracy; it merely lost the right to sell one brand of radio. If there are direct victims of the alleged conspiracy, they are the state agencies, not Gatt.

ii. There are other potential plaintiffs

As a consequence of their direct injury, the State agencies are potential plaintiffs. They constitute "an identifiable class . . . whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement." Associated General Contractors, 459 U.S. at 542. We see no reason to expect the State agencies to lack the incentive or the ability to seek relief, for example, through the courts, or through administrative proceedings.

That no agency has brought suit to date "does not support recognizing [Gatt's] standing." Daniel, 428 F.3d at 444. Instead, it suggests that either the agencies have been unaware of the collusive bidding or, perhaps, that the facts were other than as alleged by plaintiff. See Associated General Contractors, 459 U.S. at

18

542 n.47 ("[I]f there is substance to [the plaintiff's] claim, it is difficult to understand why the[ ] direct victims of the conspiracy have not asserted any claim in their own right."); cf. Phillip Areeda & Herbert Hovenkamp, Fundamentals of Antitrust Law, § 3.01c, at 3-9 to 3-10 (4th ed. 2011) ("If the 'superior' plaintiff has not sued, one may doubt the existence of any antitrust violation at all.").

### iii. Speculative injury

In addition, the bulk of Gatt's alleged damages are highly speculative. As previously discussed, Gatt contends that had it been able to submit independent, competitive bids in 2007, it would have won both the Police Department and the Transit Authority contracts. But Gatt has not plausibly alleged that in the absence of the alleged scheme, its bids—rather than the bids of some other party—would have prevailed. Presumably, PMC, Vertex, and at least six other eligible Vertex dealers could also have submitted competitive bids. Distributors of other manufacturers' products, too, might have submitted bids. Gatt offers no reason why it would have been more certain than these entities to win the contracts.

Gatt's purported damages resulting from the termination of its Dealer Agreement are even more uncertain. Gatt alleges that its revenues from Vertex-related sales and servicing fell from $784,000 (in 2007) to $30,000 (in 2008), after termination, representing a $325,000 decline in its profits. Gatt asserts that, had its license not been revoked at the end of 2007, it would have continued to see $325,000 a year in profits from Vertex sales. But the profits Gatt earned under a bid-rigging scheme shed little light on how much Gatt would earn in a competitive bidding

19

environment.  Moreover, Vertex had no obligation to authorize Gatt to sell Vertex products in the first place.  It is thus entirely uncertain whether, absent the scheme, Vertex would have entered into the Dealer Agreement with Gatt at all.

### iv. <u>Potential for duplicative recoveries</u>

Finally, and relatedly, the risk of multiple and duplicative recoveries, while perhaps not of primary concern here, provides additional support for rejecting Gatt as an efficient enforcer.  As we have observed, other Vertex dealers could assert—just as plausibly as Gatt has asserted in this case—that, had the bidding been independent, they would have bid on and won the Police Department and the Transit Authority contracts.  We recognize that other Vertex dealers may not file suit, and that future actions may well be time-barred.  <u>See</u> 15 U.S.C. § 15b (establishing four-year statute of limitations for private antitrust suits under 15 U.S.C. § 15).  Regardless, this factor too works against Gatt.

\*          \*          \*

More generally, insofar as the doctrine of antitrust standing also reflects a concern about whether the putative plaintiff is a proper party to "perform the office of a private attorney general" and thereby "vindicate the public interest in antitrust enforcement," <u>Associated General Contractors</u>, 459 U.S. at 542, Gatt hardly satisfies that concern.  Gatt freely admits that as part of the alleged scheme, it submitted numerous sham bids to government agencies in an effort to steer business to its co-conspirators and obtain business for itself.  It acknowledges obtaining over one hundred contracts as a direct result of the bid-rigging of which it now complains.  In

addition, the Gattini Affidavit strongly suggests that Gatt ceased participating in the scheme only out of its own economic self-interest—not because it recognized the error of its ways. Thus, Gatt's own behavior seriously undercuts its claim to be a suitable plaintiff for § 4 standing purposes. In sum, because Gatt has not suffered antitrust injury and has failed to satisfy any of the "efficient enforcer" factors, it lacks antitrust standing to pursue damages for the violations it alleges occurred in this case. We thus affirm the district court's dismissal of Gatt's Sherman Act § 1 claims.

### 3. *In pari delicto*

Defendants, and our concurring colleague, have argued that we should deploy the equitable doctrine of *in pari delicto* ("in equal fault") to erect a complete and simple bar to Gatt's claims, and there is some appeal to that approach. Indeed, elements of the efficient enforcer analysis that we have discussed above do overlap with the standard *in pari delicto* analysis, and Gatt's participation in the scheme would make it a particularly dubious recipient of treble damages for its belated and questionable enforcement efforts.

The Supreme Court has cautioned, however, against broad-brush application of the *in pari delicto* defense in private civil antitrust cases, reasoning that antitrust interests "are best served by insuring that the private action will be an ever-present threat to deter anyone contemplating [illegal] behavior." Perma Life Mufflers, Inc. v. Int'l Parts Corp., 392 U.S. 134, 139 (1968), overruled on other grounds by Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 765, 777 (1984). Caution seems warranted in developing contours for the application of such a

21

defense in this context, where private actions play a significant role in the enforcement scheme, as evidenced by Congress's authorization of treble damages awards to prevailing plaintiffs. This is particularly so on an appeal from the grant of a motion to dismiss, where the factual record is undeveloped.

Our Court has not to date applied the *in pari delicto* defense in private antitrust litigation. To the contrary, we have recognized that "a plaintiff's own anticompetitive conduct generally cannot be raised as a defense to liability in an antitrust action." See United States Football League v. Nat'l Football League, 842 F.2d 1335, 1369 (2d Cir. 1988). In that case, where *in pari delicto* was not raised by the defendant, we suggested in dicta that a plaintiff's anticompetitive behavior "may" be an available defense in an antitrust case if "the plaintiff was present at the creation and had a complete and continuing involvement in the monopolization scheme." Id. And, although several of our sister circuits have recognized an *in pari delicto* defense in civil antitrust litigation, they have generally done so on appeal from summary judgment or after trial, when the extent and circumstances of the culpable plaintiff's involvement have been factually developed, and the possibility that the plaintiff's behavior was motivated by economic duress—a factor that could relieve the plaintiff of an *in pari delicto* bar—has been examined. See Javelin Corp. v. Uniroyal, Inc., 546 F.2d 276, 279 (9th Cir. 1976) (summary judgment); Sullivan v. Nat'l Football League, 34 F.3d 1091, 1107 (1st Cir. 1994) (trial); General Leaseways, Inc. v. Nat'l Truck Leasing Ass'n, 830 F.2d 716, 720-24 (7th Cir. 1987) (trial); Columbia Nitrogen Corp. v. Royster Co., 451 F.2d 3, 15-16 (4th Cir. 1971) (trial). Cf.

22

Bateman Eichler, Hill Richards, Inc. v. Berner, 472 U.S. 299, 311 n.21 (1985)

(describing as "inappropriate[ ]" the undertaking to "resolve[ ] the question of [the

plaintiffs'] fault solely on the basis of the allegations set forth in the complaint").[11]

In short, because we conclude that Gatt lacks antitrust standing to

pursue its antitrust claims, and the factual record is undeveloped, we do not reach

the question whether some form of the doctrine of *in pari delicto* should be adopted in

our Circuit for application in § 4 actions, and, if so, whether it would bar Gatt's

claims.

B.    Donnelly Act Claim

New York's Donnelly Act prohibits "[e]very contract, agreement,

arrangement or combination whereby . . . competition . . . may be restrained."  N.Y.

Gen. Bus. Law § 340(1).  The New York Court of Appeals has held that the Donnelly

Act, which was modeled on the Sherman Act, "should generally be construed in light

of Federal precedent and given a different interpretation only where State policy,

differences in the statutory language or the legislative history justify such a result."

X.L.O. Concrete Corp. v. Rivergate Corp., 83 N.Y.2d 513, 518 (1994) (internal

quotation marks omitted).  The Sherman Act provides a cause of action for "any

person who shall be injured in his business or property by reason of anything

---

[11] Varying formulations of the *in pari delicto* defense have been articulated and applied; which of them would be most appropriate in the antitrust context would bear careful examination. Cf. Bateman Eichler, 472 U.S. at 310-11 (declining to adopt wholesale *in pari delicto* rule in securities law context and holding that "a private action for damages . . . may be barred on the grounds of the plaintiff's own culpability only where (1) as a direct result of his own actions, the plaintiff bears at least substantially equal responsibility for the violations he seeks to redress, and (2) preclusion of suit would not significantly interfere with the effective enforcement of the securities laws and protection of the investing public").

forbidden in the antitrust laws," 15 U.S.C. § 15(a), while the Donnelly Act similarly permits suit by "any person who shall sustain damages by reason of any violation of this section," N.Y. Gen. Bus. Law § 340(5). We see no reason—nor has Gatt provided any—to interpret the Donnelly Act differently than the Sherman Act with regard to antitrust standing. Cf. Continental Guest Servs. Corp. v. Int'l Bus Servs., Inc., 939 N.Y.S. 2d 30, 33-34 (1st Dep't 2012) (stating that Donnelly Act claims should have been dismissed for lack of antitrust standing because plaintiff was neither consumer nor competitor in relevant market and antitrust violations could be vindicated by other potential plaintiffs with more direct injuries (citing Associated General Contractors, 459 U.S. at 542)). Therefore, for the reasons previously discussed with respect to Gatt's want of antitrust standing to pursue its Sherman Act claims, we also affirm the dismissal of Gatt's Donnelly Act claims.

C.      State Common Law Tort Claims

Finally, we affirm the district court's dismissal of Gatt's state common law claims substantially for the reasons stated by the district court in its thorough consideration of these claims and as briefly summarized above. Gatt, 2011 WL 1044898, at *6-7.

CONCLUSION

We have considered Gatt's remaining arguments and find them to be without merit. For the reasons stated above, the decision of the district court is AFFIRMED.

24

Wesley, *J.*, concurring:

I concur in the excellent reasoning of Judge Carney and her conclusion that Gatt lacks standing to bring federal or state antitrust claims and that its tort claims are without merit.  I write separately because, although the anti-trust standing issue can serve as a basis for dismissal,  I believe this is a paradigmatic case for dismissal under the doctrine of *in pari delicto*.[1]

The facts in this case are extraordinary and exceptionally troubling.  As noted by the Majority, Gatt admits that it knowingly participated in the bid-rigging scheme by either entering dummy bids or not submitting bids at PMC's direction.  Gatt also readily admits that "[o]n over 100 occasions," it benefited from the scheme by receiving contracts from various New York City public schools.  Gattini Aff. ¶ 28.  Indeed, Pietro Gattini, Gatt's

---

[1] We are not compelled to determine whether Gatt has antitrust standing before addressing the doctrine of *in pari delicto*.  Antitrust standing involves an analysis of prudential considerations aimed at "avoid[ing] counter-productive use of antitrust laws in ways that could harm competition rather than protecting it." *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 121 (2d Cir. 2007).  In this vein, it is distinct from Article III standing, which must be assessed before reaching the *in pari delicto* defense.  *Cf. In re Senior Cottages of Am., LLC*, 482 F.3d 997, 1002-03 (8th Cir. 2007); *see also Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 459 n.3 (2010).

owner and president,[2] recounts in detail Gatt's understanding of, and willing participation in, the bid-rigging scheme:

> 27. From about 2003 to 2007, when Gatt would be told that two other bids would be needed besides Gatt's bid to get a school to buy, [I] would telephone PMC and speak to either Vesel Ramovic or Phillip Casciano about the request and was told: "Just fax us a copy of Gatt's bid, and we will take care of arranging the other bids so Gatt will get the sale." Vesel Ramovic and/or Phillip Casciano had previously explained to me that whatever Gatt was bidding, the bids obtained by PMC would be higher but would be sent in as if they were independent because PMC had arranged with other Vertex dealers to supply these bids just as Gatt was expected to put in a bid dictated by PMC when requested to do so.

> 28. Thereafter, in more than one hundred instances, Gatt regularly obtained requests to put in a bid from individual schools for Vertex radios, mailed, faxed or emailed in bids in response, sent faxed, emailed or mailed copies of each bid to PMC, at PMC's direction other Vertex dealers and/or PMC would prepare and either mail, fax or email in their

---

[2] I agree with the Majority that we may consider the Gattini Affidavit. Generally, the harm to the plaintiff when a court considers material extraneous to a complaint without converting the claim into one for summary judgment is the lack of notice that the material may be considered. But "[w]here plaintiff has actual notice of all the information . . . and has relied upon [the] documents in framing the complaint the necessity of translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated." *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991). Gatt relied on the Gattini affidavit in its briefs to the district court and on appeal, as well as during oral argument. The information and documents contained therein are known by Gatt and were employed by it in framing the complaint. There is no reason we should not consider it on appeal.

> "independent" bids, and Gatt would thereafter receive mailed or faxed purchase orders from the New York City Department of Education for the Vertex radios being offered by Gatt. It is [my] understanding that the "dummy bids" arranged or produced by PMC in aid of all of these school sales were framed high so that Gatt's bid would be the lowest. . . . That is to say, the bids were orchestrated and fixed by PMC in a manner calculated to deceive each school requesting the bids. The effect of this practice was to deprive each school of the advantage or benefit or price discount which might have been obtained if there had been bona fide competitive bidding.

Gattini Aff.

Given Gatt's unabashed participation in the bid-rigging scheme, its claims should be barred under the doctrine of *in pari delicto*. This common law defense provides that "a plaintiff who has participated in wrongdoing may not recover damages resulting from the wrongdoing." Black's Law Dictionary 794 (9th ed. 2009). It "derives from the Latin, *in pari delicto potior est conditio defendentis*: 'In a case of equal or mutual fault . . . the position of the [defending] party . . . is the better one.'" *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 306 (1985) (citations omitted). The doctrine is based on the policy that "courts should not lend their good offices to mediating disputes among wrongdoers" and "denying judicial

3

relief to an admitted wrongdoer is an effective means of deterring illegality." *Id.* Courts employ the doctrine in a wide variety of contexts. *See, e.g., Pinter v. Dahl*, 486 U.S. 622, 633-34 (1988); *see also BrandAid Mktg. Corp. v. Biss*, 462 F.3d 216, 218-19 (2d Cir. 2006) (applying the *in pari delicto* analysis to a claim for tortious interference with contract but finding that plaintiffs' wrongdoing was insufficient for the defense to merit dismissal).

The Supreme Court has considered the application of the *in pari delicto* doctrine in the enforcement of antitrust and securities laws. *Bateman Eichler*, 472 U.S. at 299; *Perma Life Mufflers, Inc. v. Int'l Parts Corp.*, 392 U.S. 134 (1968), *overruled on other grounds by Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984). Although in both instances the Court declined to apply the doctrine, the Court explained that the doctrine would be appropriate where the plaintiff was substantially involved in the unlawful activity and preclusion of suit would not interfere with the policy goals of the federal statute.

In *Perma Life*, the Court declined to employ *in pari delicto* where "a private suit serves important public purposes." *Perma Life Mufflers, Inc.*, 392 U.S. at 138. The

4

Court did indicate that "the doctrine of *in pari delicto* . . . is not to be recognized as a defense to an antitrust action." *Id.* at 140. But the basis for that decision was that the opponents entangled in the illegal scheme were of decidedly unequal strength. The plaintiffs, the Court noted, "participated to the extent of utilizing illegal arrangements formulated and carried out by others . . . [but] their participation was not voluntary in any meaningful sense." *Id.* at 139.

Recognizing that the scheme had been thrust upon plaintiffs, the Court *reserved the question* of whether a plaintiff who engaged in "truly complete involvement and participation in a monopolistic scheme"—one who "aggressively support[ed] and further[ed] the monopolistic scheme as a necessary part and parcel of it"—could be barred from pursuing a damages action. *Id.* at 140. In concurrences, five members of the *Perma Life* Court favored barring suit by antitrust plaintiffs who were substantially involved in the conspiracy.[3]

---

[3] *See Perma Life Mufflers, Inc.*, 392 U.S. at 146 (White, *J.*, concurring) ("I would deny recovery where plaintiff and defendant bear substantially equal responsibility for injury resulting to one of [the co-conspirators] ...."); *id.* at 147 (Fortas, *J.*, concurring) (Suit should be barred when "the fault of the parties is reasonably within the same scale."); *id.* at 149 (Marshall, *J.*,

The Court's subsequent decision in *Bateman Eichler*
reinforced this view. In *Bateman Eichler*, the Court
addressed whether *in pari delicto* is an available defense to
a private action for damages brought under the federal
securities laws. *Bateman Eichler*, 472 U.S. at 301. After
noting that the "views expressed in *Perma Life* apply with
full force to implied causes of action under the federal
securities laws," the Court held that a private action for
damages under federal securities laws may be barred under
the doctrine of *in pari delicto* where "(1) as a direct
result of his own actions, the plaintiff bears at least
substantially equal responsibility for the violations he
seeks to redress, and (2) preclusion of suit would not
significantly interfere with the effective enforcement of
the securities laws and protection of the investing public."
*Id.* at 310-11.[4]

---

concurring) ("I would hold that where a defendant in a private
antitrust suit can show that the plaintiff actively participated
in the formation and implementation of an illegal scheme, and is
substantially equally at fault, the plaintiff should be barred
from imposing liability on the defendant."); *id.* at 153 (Harlan,
*J.*, concurring in part and dissenting in part) (Stewart, *J.*,
joining) ("[P]roperly used[, in pari delicto] refers to a defense
that should be permitted in antitrust cases.").

[4] I fail to see how this is "broad-brush application of the
*in pari delicto* defense" as the Majority seems to imply.
*Majority Opinion* at 22.

In light of the Court's reasoning, every one of our sister circuits to consider the issue has held that antitrust plaintiffs who actively participate in the illegal scheme and who are substantially at fault are barred from suit. *See, e.g.*, *Sullivan v. Nat'l Football League*, 34 F.3d 1091, 1107 (1st Cir. 1994); *Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*, 830 F.2d 716, 720-23 (7th Cir. 1987); *Javelin Corp. v. Uniroyal, Inc.*, 546 F.2d 276, 279 (9th Cir. 1976); *Columbia Nitrogen Corp. v. Royster Co.*, 451 F.2d 3, 16 (4th Cir. 1971). Although we have yet to address the issue, we have recognized that "[t]he [in pari delicto] defense may be available . . . when the plaintiff was present at the creation and had a complete and continuing involvement in the monopolization scheme." *U.S. Football League v. Nat'l Football League*, 842 F.2d 1335, 1369 (2d Cir. 1988).

This case is certainly a good candidate for the view that a cause of action under the Sherman Act is barred where (1) the plaintiff is an active and willing participant in the illegal activity, and (2) dismissing the suit does not significantly interfere with the policy goals underlying the

7

act.[5]

The record is plain that Gatt was an active and willing participant in the bid-rigging scheme. Gatt readily, and repeatedly, admits to its participation in, and benefit from, the coordinated effort to defraud various New York State and City governmental agencies. Gatt admits that there were numerous instances in which it sought the assistance of PMC to coordinate sham bids to enrich Gatt from government contracts. Indeed, Gatt's president and owner discusses at length how Gatt engaged in bid-rigging "in more than one hundred instances" and reaped the benefits therefrom. Gattini Aff. ¶ 28.

The Majority is reluctant to apply the doctrine of *in pari delicto* because, in its view, the factual record is not developed and warns that other circuits have considered the application of *in pari delicto* following a trial or summary judgment. While that word of caution does make general sense it ignores the rather unusual circumstance of this case. Gatt's complaint, its appellate brief, and the

---

[5] As the Majority notes there are other potential plaintiffs (the state agencies that purchased equipment as a result of the bid rigging scheme) whose own interests would surely motivate them to vindicate the public interest in antitrust enforcement. *Majority* at 19.

Gattini affidavit make clear that Gatt coordinated with PMC to make sham bids to rig the bidding process to its benefit. From Gatt's own hand there can be no doubt that there was no coercion here. Gatt participated in the scheme for several years and was motivated by its own self interest. Gattini Aff. ¶¶ 27-28. And its participation in the scheme paid off. According to Gatt, its business grew rapidly from 2002 to 2007, and it became "one of the most productive Vertex dealers in the United States." Am. Compl. ¶ 35.

Furthermore, application of the *in pari delicto* doctrine will not interfere with the policy goals underlying the Sherman Act, as suggested by the Majority. Indeed, Gatt's recovery under the Sherman Act could not further the act's essential purpose: "safeguarding consumer welfare." *Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton Coll.*, 128 F.3d 59, 63 (2d Cir. 1997). Instead, it would have the perverse effect of redistributing ill-gotten gains among similarly situated conspirators. To entertain a dispute under these circumstances would be a waste of valuable judicial resources and offend the public interest.

For the foregoing reasons, I would dismiss on the basis of *in pari delicto*.