DirecTV, LLC v. Nexstar Media Group, Inc.

# In the
# United States Court of Appeals
## FOR THE SECOND CIRCUIT

---

AUGUST TERM 2024
No. 24-981

**DIRECTV, LLC,**
*Plaintiff-Appellant,*

v.

**NEXSTAR MEDIA GROUP, INC., MISSION BROADCASTING, INC.,
WHITE KNIGHT BROADCASTING, INC.,**
*Defendants-Appellees.*[*]

---

On Appeal from the United States District Court
for the Southern District of New York

---

ARGUED: DECEMBER 9, 2024
DECIDED: DECEMBER 16, 2025

---

Before:      CHIN, SULLIVAN, and MENASHI, *Circuit Judges*.

DirecTV, LLC, is a multichannel video programming distributor that provides customers with satellite and streaming access to broadcast television programming. DirecTV purchases the rights to distribute television stations from broadcasters, and it then

---

[*] The Clerk of Court is directed to amend the caption as set forth above.

includes the stations in subscription plans that it sells to consumers. The defendants are broadcasters that own broadcasting rights for popular television networks in specific geographic markets. DirecTV sued the defendants on the ground that the defendants engaged in a horizontal price-fixing conspiracy intended to force DirecTV to accede to higher prices or face the loss of programming. The district court dismissed the antitrust claims, holding that DirecTV lacked antitrust standing because (1) it did not actually pay the supracompetitive prices demanded by the alleged price-fixing conspiracy and therefore could not establish antitrust injury, and (2) as a nonpurchaser suffering only an "indirect" and "speculative" injury, it was not an efficient enforcer of the alleged antitrust violation.

We hold that DirecTV has antitrust standing to proceed on its federal antitrust claims. Lost profits from a reduction in output represent a cognizable antitrust injury, and DirecTV has plausibly alleged that its lost profits flowed directly from the output-reducing effects of the alleged price-fixing conspiracy. Additionally, we conclude that DirecTV is an efficient enforcer of the antitrust laws. We reverse the judgment insofar as the district court held that DirecTV lacked antitrust standing to pursue its federal antitrust claims. We vacate the judgment insofar as the district court declined to exercise supplemental jurisdiction over the remaining state law claims. We remand for further proceedings consistent with this opinion.

Judge Sullivan dissents in a separate opinion.

———————

PAUL MEZZINA, King & Spalding LLP, Washington, DC (Olivier N. Antoine, Jared Levine, Crowell & Moring LLP, New York, NY, Amanda Shafer Berman, Crowell &

Moring LLP, Washington, DC, Jordan L. Ludwig, Crowell & Moring LLP, Los Angeles, CA, *on the brief*), *for Plaintiff-Appellant*.

Lauren Willard Zehmer, Covington & Burling LLP, Washington, DC, David W. Haller, Covington & Burling LLP, New York, NY, Chris Schwegmann, Lynn Pinker Hurst & Schwegmann LLP, Dallas, TX, *for Defendant-Appellee Nexstar Media Group, Inc.*

STEPHEN J. OBERMEIER (Frank Scaduto, Enbar Toledano, Michael J. Showalter, *on the brief*), Wiley Rein LLP, Washington, DC, *for Defendant-Appellee Mission Broadcasting, Inc.*

Kan M. Nawaday, Venable LLP, New York, NY, Craig A. Gilley, Venable LLP, Washington, DC, Elizabeth C. Rinehart, Venable LLP, Baltimore, MD, *for Defendant-Appellee White Knight Broadcasting, Inc.*

ANDREW N. DELANEY, Attorney (Jonathan S. Kanter, Assistant Attorney General, Doha G. Mekki, Principal Deputy Assistant Attorney General, John W. Elias, Deputy Assistant Attorney General, David B. Lawrence, Policy Director, Alice A. Wang, Counsel to the Assistant Attorney General, John J. Sullivan, Daniel E. Haar, Nickolai G. Levin, Attorneys, *on the brief*), United States Department of Justice Antitrust Division, Washington, DC, *for the United States as Amicus Curiae*.

_____

MENASHI, *Circuit Judge*:

Plaintiff-Appellant DirecTV, LLC, is a multichannel video programming distributor that provides customers with satellite and

3

streaming access to broadcast television programming. DirecTV purchases the rights to distribute television stations from broadcasters, and it then includes the stations in subscription plans that it sells to consumers. Defendants-Appellees Nexstar Media Group, Inc. ("Nexstar"), Mission Broadcasting, Inc. ("Mission"), and White Knight Broadcasting, Inc. ("White Knight") are broadcasters that own broadcasting rights for popular television networks in specific geographic markets. DirecTV sued the defendants for violations of the federal antitrust laws and for related contract and tort claims arising under New York law. According to DirecTV, the defendants engaged in a horizontal price-fixing conspiracy intended to force DirecTV to accede to higher prices or face the loss of programming. DirecTV alleges that it did not renew its licensing agreements with Mission and White Knight because it declined to pay the supracompetitive fees, resulting in station blackouts that led to the loss of subscribers and profits.

The district court dismissed the antitrust claims, holding that DirecTV lacked antitrust standing because (1) it did not actually pay the supracompetitive prices demanded by the alleged price-fixing conspiracy and therefore could not establish antitrust injury, and (2) as a nonpurchaser suffering only an "indirect" and "speculative" injury, it was not an efficient enforcer with respect to the alleged antitrust violation. *DIRECTV, LLC v. Nexstar Media Grp., Inc.*, 724 F. Supp. 3d 268, 280 (S.D.N.Y. 2024). On appeal, DirecTV seeks reversal of the holding that it lacked antitrust standing. DirecTV argues that its lost profits stemming from station blackouts represent a cognizable antitrust injury and that the four efficient-enforcer factors support antitrust standing in this case.

We agree. We hold that DirecTV has antitrust standing to proceed on its federal antitrust claims. We reverse the judgment

4

insofar as the district court held that DirecTV lacked antitrust standing to pursue its federal antitrust claims. Lost profits resulting from a reduction in output represent a cognizable antitrust injury, and DirecTV plausibly alleges that its lost profits flowed directly from the output-reducing effects of the alleged price-fixing conspiracy. Additionally, DirecTV plausibly alleges that it is an efficient enforcer of the antitrust laws because it was the direct target of the defendants' purported price-fixing conspiracy and it has a longstanding history of reaching agreements with the defendants. We vacate the judgment insofar as the district court declined to exercise supplemental jurisdiction over the remaining state law claims because that decision depended—at least in part—on the dismissal of the federal antitrust claims. We remand for further proceedings consistent with this opinion.

## BACKGROUND

On appeal from the grant of a motion to dismiss, we accept as true the facts alleged in the complaint and draw all reasonable inferences in favor of DirecTV. *See Henry v. County of Nassau*, 6 F.4th 324, 328 (2d Cir. 2021).

## I

Nexstar, Mission, and White Knight are broadcast station groups that own local affiliates of popular television networks in local markets known as designated market areas ("DMAs"). Each defendant owns stations affiliated with the "Big-4" networks: ABC, CBS, NBC, and Fox.

DirecTV is a multichannel video programming distributor ("MVPD") that provides customers with satellite and streaming access to broadcast television programming. MVPDs such as DirecTV create bundled television packages that enable viewers to access

5

multiple channels through a single subscription. To attract and retain subscribers, MVPDs must offer local affiliates of the Big-4 networks, which are "typically the highest ranked in terms of audience share and ratings in each DMA." App'x 34 (¶ 80).

To provide its subscribers access to a particular broadcast network, the MPVD negotiates a retransmission consent agreement ("RCA") with a broadcast station group. These agreements generally give the MVPD the right to carry the full-time feed of a station in exchange for a negotiated "retransmission consent fee." *Id.* at 14 (¶ 4). If a negotiation fails or an RCA expires without renewal, the MVPD loses transmission rights and the broadcast content is "blacked out" for the MVPD's subscribers until a new agreement is reached. *Id.* at 29 (¶ 62). The MPVD seeks to avoid blackouts because subscribers may cancel their subscriptions if they lose access to Big-4 stations.

To promote competition among broadcasters, regulations of the Federal Communications Commission and the federal antitrust laws generally prohibit a single broadcast station group from owning, operating, or controlling two or more of the Big-4 stations within any given DMA. This is known as the "Duopoly Rule." *Id.* at 14 (¶ 5). When a broadcast group wants to acquire a second Big-4 affiliate within a single DMA, it generally must divest one of its Big-4 stations to another broadcaster to comply with the Duopoly Rule. Some large broadcast station groups, including Nexstar, have developed a practice of transferring the divested Big-4 stations to "shell" station groups, known in the industry as "sidecars." *Id.* at 27 (¶¶ 55-56). Under the sidecar business model, the large broadcast group typically exercises operational and financial influence over the sidecar and performs the basic functions of station operation. But FCC regulations require the sidecar to remain independent in key respects. Among other things, the sidecar must negotiate its own RCAs with MVPDs

6

over Big-4 stations in "overlap" DMAs—that is, in markets where both the sidecar and the large broadcast group own a Big-4 station. *Id.* at 15 (¶ 9).

In recent years, Nexstar has engaged in high-profile acquisitions of other broadcast groups and has become the largest American broadcaster, with 200 owned or operated stations in 116 American markets. *See id.* at 30 (¶ 65). When a proposed acquisition would result in Nexstar owning more than one Big-4 station in a particular DMA, Nexstar divests a Big-4 station to one of its sidecars and then enters into relationships with those entities. *See id.* at 30-31 (¶ 67). Typically, Nexstar's sidecars "retained nominal ownership interests in the stations themselves, but Nexstar fully coordinated their competitive direction." *Id.* at 31 (¶ 67).

Mission and White Knight are two sidecars of Nexstar. At the time the complaint was filed, Mission owned Big-4 stations in twenty-three DMAs, and White Knight owned Big-4 stations in two DMAs. In each of these markets, Nexstar maintained a competing Big-4 station. *See id.* at 32-33 (¶¶ 71-74).

Despite the separate ownership of Mission and White Knight, Nexstar includes their financial data in its filings with the Securities and Exchange Commission because Nexstar controls key activities affecting the sidecar companies' economic performance. Nexstar has told investors that it has historically collected "substantially all" of these companies' available cash and expects to continue doing so. *Id.* at 33 (¶ 75). Additionally, Nexstar holds options to purchase the companies' station assets and to assume their liabilities at any time.

## II

In June 2022, DirecTV began negotiating the renewal of its RCAs with Mission and White Knight. Despite federal regulations

that prohibit Nexstar from coordinating with its sidecar companies during RCA negotiations, Mission and White Knight entered into an agreement "with Nexstar to raise prices and extract supracompetitive retransmission consent fees from DIRECTV in 'overlap' DMAs." *Id.* at 15 (¶ 9). DirecTV alleges that Mission and White Knight "effectively relinquished decision-making authority to Nexstar" and that Nexstar "orchestrated" the negotiations through a single consultant, Eric Sahl, who was "the exclusive and common negotiator and spokesperson for all of [Nexstar's] sidecars, including Mission and White Knight." *Id.* at 16 (¶¶ 10-11). Sahl did not conduct independent negotiations for each of the companies but instead coordinated contractual terms in order to serve Nexstar's interests. When DirecTV attempted to negotiate directly with the management teams at Mission and White Knight, it was allegedly told that all negotiations had to proceed through Sahl.

According to the complaint, Sahl demanded supracompetitive fee increases that were "radically disproportionate" to Mission's and White Knight's station portfolios and were "intentionally calculated to prevent the parties from reaching an agreement." *Id.* at 37 (¶¶ 97, 99). During the negotiations, Sahl allegedly referenced non-public information about Nexstar's business strategies and made demands that undermined Mission's and White Knight's independent economic interests but benefited Nexstar.

After DirecTV refused to pay the demanded rates, Mission and White Knight withdrew their signals in October 2022, causing a blackout of their stations for nearly one million DirecTV subscribers. Nexstar, Mission, and White Knight then issued materially identical press releases concerning the blackouts. DirecTV alleges that the identical statements in the three press releases originated from Nexstar.

According to DirecTV, Nexstar's alleged price-fixing conspiracy with Mission and White Knight served two purposes. First, Nexstar would benefit directly from the higher prices charged by Mission and White Knight because it "receives substantially all of their profits." *Id.* at 33 (¶ 77). Second, Nexstar was preparing for its own contract renewal negotiations with DirecTV. DirecTV claims that by directing its sidecars to raise rates, Nexstar could rely on those precedents to demand similarly inflated rates during its own negotiations with DirecTV.

### III

On March 15, 2023, DirecTV commenced this action against Nexstar, Mission, and White Knight, alleging antitrust violations under § 1 of the Sherman Act, 15 U.S.C. § 1, as well as breach of contract and tort claims under New York law.

With respect to the Sherman Act claim, which is the focus of this appeal, the complaint alleges that the "relevant product market in this case is the market for retransmission consent of Big-4 stations. In this market, broadcast station groups such as Nexstar are the 'sellers' and MVPDs are the 'buyers.'" App'x 34 (¶ 78). DirecTV alleges that "Big-4 stations are typically the highest ranked in terms of audience share and ratings in each DMA, primarily due to their unique and high-value content, including professional sports, popular primetime network programs, local news, and tentpole events." *Id.* (¶ 80). As a result, "[d]uring retransmission consent negotiations, MVPDs know that subscribers may cancel their service if they do not have access to Big-4 stations because such a blackout prevents them from watching local news and weather, prime time network shows, tentpole events (such as The Oscars and The Emmys), and live sports (such as NFL, NBA, MLB, and NHL games, as well as

college football and basketball games) on the affected Big-4 stations." *Id.* at 29 (¶ 63). DirecTV alleges that broadcast station groups use the threat of "potential subscriber losses associated with a broadcast station group's stations going dark" to increase their bargaining leverage. *Id.* (¶ 64).

DirecTV contends that Nexstar, Mission, and White Knight engaged in a horizontal price-fixing conspiracy that was specifically intended to force DirecTV to accede to higher retransmission consent fees or face the loss of programming. DirecTV alleges that it "has been deprived of a fair competitive process and has been forced to either accept higher prices or lose access to Mission's and White Knight's networks. Choosing the lesser of two evils, DIRECTV has refused Defendants' supracompetitive, price-fixed demands, resulting in a reduction in output" in the form of blacked-out stations. *Id.* at 51 (¶ 156). DirecTV claims that thousands of customers canceled subscriptions due to the blackouts, resulting in substantial lost profits. In its prayer for relief, DirecTV seeks monetary damages for lost subscriber revenue and a permanent injunction prohibiting Nexstar from unlawfully coordinating on retransmission consent negotiations with Mission, White Knight, or other sidecar companies.

On June 26, 2023, the defendants moved to dismiss the complaint. On March 20, 2024, the district court granted the motion and dismissed DirecTV's antitrust claims for lack of antitrust standing. The district court declined to exercise supplemental jurisdiction over the remaining state law claims. The district court concluded that DirecTV had Article III standing but failed to plausibly allege antitrust standing. Specifically, the district court decided that the complaint established neither that DirecTV suffered an antitrust injury nor that it was an efficient enforcer of the antitrust laws.

With respect to antitrust injury, the district court held that horizontal price fixing can cause anticompetitive harm only through the "payment of supracompetitive prices." *DIRECTV*, 724 F. Supp. 3d at 278. The district court reasoned that because DirecTV chose not to pay the allegedly fixed prices "but instead made the unilateral decision to abandon RCA negotiations," its losses "flow from its own choice to exit the market" rather than from the anticompetitive conduct. *Id.* The district court further held that—because it was a nonpurchaser suffering only an "indirect" and "speculative" injury— DirecTV had not alleged that it would be an efficient enforcer of the antitrust laws against the alleged conspiracy. *Id.* at 280. Following the entry of the judgment, DirecTV timely appealed.

## DISCUSSION

"We review a district court's grant of a motion to dismiss *de novo*, accepting as true all factual claims in the complaint and drawing all reasonable inferences in the plaintiff's favor." *In re Am. Express Anti-Steering Rules Antitrust Litig.*, 19 F.4th 127, 137 (2d Cir. 2021) (quoting *Henry*, 6 F.4th at 328).

DirecTV argues that the district court erred by dismissing its federal antitrust claims for lack of antitrust standing. DirecTV contends that the district court correctly held that it adequately pleaded Article III standing but incorrectly held that (1) payment of overcharges is the sole type of injury for which a private consumer plaintiff may recover in a price-fixing case, and (2) DirecTV is not an efficient enforcer of this antitrust lawsuit. We address each argument in turn.

## I

We begin with the defendants' argument that DirecTV lacks Article III standing. To establish constitutional standing, "a plaintiff

11

must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). The defendants maintain that the district court misapplied these standards and that, under a correct application, DirecTV has not adequately alleged either causation or redressability.

The district court held that DirecTV adequately alleged causation because "to establish constitutional standing, a plaintiff need not allege that its injury is '*plausibly* fairly traceable, but, rather, that the injury is *possibly* fairly traceable.'" *DIRECTV*, 724 F. Supp. 3d at 277 (alteration omitted) (quoting *Dennis v. JPMorgan Chase & Co.*, 343 F. Supp. 3d 122, 156 (S.D.N.Y. 2018)). Other district courts in this circuit have used the "possibly fairly traceable" standard when describing the pleading requirements for Article III standing.[1] We agree with the defendants that this formulation is incorrect.

Our precedents explain that a plaintiff "must allege facts that affirmatively and plausibly suggest that it has standing to sue." *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011). Throughout a litigated case, each of the three elements of

---

[1] *See, e.g., Toretto v. Donnelley Fin. Sols., Inc.*, 523 F. Supp. 3d 464, 472 (S.D.N.Y. 2021); *A.H. by & through Hester v. French*, 555 F. Supp. 3d 21, 34-35 (D. Vt. 2021); *Hoeffner v. D'Amato*, 605 F. Supp. 3d 467, 476 (E.D.N.Y. 2022); *Doe v. Columbia Univ.*, No. 20-CV-6770, 2022 WL 4537851, at *17 (S.D.N.Y. Sept. 28, 2022); *Xu v. HHS*, No. 22-CV-3539, 2023 WL 5740416, at *4 (E.D.N.Y. Sept. 6, 2023); *Sarno v. Sun Life & Health Ins. Co. (U.S.)*, No. 22-CV-968, 2024 WL 291624, at *5 (E.D.N.Y. Jan. 25, 2024), *overruled in part on other grounds*, No. 22-CV-968, 2024 WL 1364341 (E.D.N.Y. Mar. 31, 2024); *M.V.B. Collision Inc. v. State Farm Ins. Co.*, No. 22-CV-7969, 2024 WL 3379335, at *4 (E.D.N.Y. July 11, 2024).

standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). At the pleading stage, the plaintiff may rely on factual allegations in the complaint. But those factual allegations, when credited, must "allow[] the court to draw the reasonable inference" that the plaintiff suffered an injury caused by the defendant that a court could redress. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The requirement that a pleading allow for that reasonable inference "asks for more than a sheer possibility" that the elements of standing are satisfied. *Id.*

To be sure, "[w]e have cautioned against arguments that 'would essentially collapse the standing inquiry into the merits.'" *SM Kids, LLC v. Google LLC*, 963 F.3d 206, 212 (2d Cir. 2020) (quoting *Baur v. Veneman*, 352 F.3d 625, 642 (2d Cir. 2003)). But we have exercised such caution because "[t]he standing question is distinct from whether [the plaintiff] has a cause of action." *Carver v. City of New York*, 621 F.3d 221, 226 (2d Cir. 2010). As a result, "[o]ur threshold inquiry into standing 'in no way depends on the merits of the [plaintiff's] contention that particular conduct is illegal.'" *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990) (quoting *Warth v. Seldin*, 422 U.S. 490, 500 (1975)). In conducting the standing inquiry, we "put aside" the merits of the plaintiff's claims and "consider whether he has established the existence of a 'case or controversy.'" *Id.* To the extent that we have emphasized that a plaintiff need not establish entitlement to relief to meet the elements of Article III standing, we have done so to distinguish the standing inquiry from the merits— not to exempt standing from the normal plausibility standard that applies to all factual allegations at the pleading stage.

13

Applying the correct standard, we conclude that DirecTV has plausibly alleged both causation and redressability. The defendants argue that DirecTV's theory of causation is "too speculative and too attenuated" to confer standing because its allegations rest on speculative assumptions about whether the parties would have reached an agreement absent the alleged conspiracy and whether subscribers would have remained with DirecTV in the absence of content blackouts. Appellees' Br. 18.

We disagree. DirecTV alleges that the defendants conspired to demand "radically disproportionate" fees that were "intentionally calculated to prevent the parties from reaching an agreement." App'x 37 (¶¶ 97, 99). DirecTV further alleges that when it refused the inflated demands, Mission and White Knight pulled their signals, causing blackouts for DirecTV subscribers that directly and foreseeably led to subscriber cancellations and lost profits. Viewed in the light most favorable to DirecTV, these allegations allow for the reasonable inference that the defendants' alleged price fixing caused the breakdown in negotiations and the resulting subscriber losses.

The existence of possible alternative explanations for DirecTV's injuries does not defeat standing at the pleading stage. It is sufficient that the alleged harm was "likely attributable at least in part" to the defendants' anticompetitive conduct. *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019). The possibility that broader market trends might have contributed to DirecTV's subscriber losses does not render implausible DirecTV's theory that at least some of the harm it suffered was fairly traceable to the defendants' conduct.

The defendants also argue that DirecTV has not plausibly alleged that its injury is redressable. Because the defendants retain discretion over whether to contract with DirecTV—and could refuse

to sign an RCA for reasons unrelated to a price-fixing conspiracy—the defendants insist that judicial relief cannot redress the harm to DirecTV of failing to obtain an RCA. But DirecTV does not seek a judicial order directing the defendants to sign an RCA. As noted, DirecTV has plausibly alleged that its past economic harm was fairly traceable to the defendants' conduct. An award of damages can redress a past economic injury. To the extent that DirecTV seeks prospective injunctive relief, it does so to prevent further anticompetitive coordination. DirecTV requests an injunction prohibiting the defendants from coordinating RCA negotiations and from sharing competitively sensitive information. We need not decide at this stage whether DirecTV will necessarily be entitled to that relief. To establish standing to seek it, however, DirecTV must plausibly allege that a "risk" of future harm "would be reduced" if it were to receive that relief. *Massachusetts v. EPA*, 549 U.S. 497, 526 (2007). In light of its allegations that anticompetitive coordination led to an injury that had not occurred under previous market conditions, DirecTV has satisfied that standard. We conclude that DirecTV has Article III standing to maintain its suit.

## II

We next consider whether DirecTV has plausibly alleged antitrust standing. "It is a well-established principle that, while the United States is authorized to sue anyone violating the federal antitrust laws, a private plaintiff must demonstrate 'standing.'" *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 436 (2d Cir. 2005). The doctrine of antitrust standing "originates in the Supreme Court's recognition that … 'Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation.'" *Id.* at 436-37 (quoting *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters (AGC)*,

459 U.S. 519, 534 (1983)). The antitrust standing requirement "prevents private plaintiffs from recovering damages" under the federal antitrust laws "merely by showing injury causally linked to an illegal presence in the market." *Gatt Commc'ns, Inc. v. PMC Assocs., LLC*, 711 F.3d 68, 76 (2d Cir. 2013) (internal quotation marks and alteration omitted).

To establish antitrust standing, "a private plaintiff must show both that (1) 'it suffered a special kind of antitrust injury' and that (2) 'it is a suitable plaintiff to pursue the alleged antitrust violations and thus is an efficient enforcer of the antitrust laws.'" *Am. Express*, 19 F.4th at 138 (quoting *Gatt*, 711 F.3d at 76). The district court concluded that DirecTV lacked antitrust standing because it had not plausibly alleged either that it suffered antitrust injury or that it was an efficient enforcer of the antitrust laws with respect to the purported violation. We disagree on both points.

**A**

We employ a three-step process to determine whether a plaintiff has alleged an antitrust injury. First, the plaintiff must "identify the practice complained of and the reasons such a practice is or might be anticompetitive." *Gatt*, 711 F.3d at 76 (alteration omitted) (quoting *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 122 (2d Cir. 2007)). Second, the court must "identify the actual injury the plaintiff alleges" by looking "to the ways in which the plaintiff claims it is in a worse position as a consequence of the defendant's conduct." *Id.* (internal quotation marks omitted). Third, "the court must 'compare the anticompetitive effect of the specific practice at issue to the actual injury the plaintiff alleges.'" *Harry v. Total Gas & Power N. Am., Inc.*, 889 F.3d 104, 115 (2d Cir. 2018) (quoting *Gatt*, 711 F.3d at 76). "It is not enough for the actual injury to be

'causally linked' to the asserted violation." *Gatt*, 711 F.3d at 76 (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). "Rather, in order to establish antitrust injury, the plaintiff must demonstrate that its injury is 'of the type the antitrust laws were intended to prevent and that flows from that which makes or might make defendants' acts unlawful.'" *Id.* (alteration omitted) (quoting *Daniel*, 428 F.3d at 438). "An antitrust injury 'should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation.'" *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 772 (2d Cir. 2016) (quoting *Brunswick Corp.*, 429 U.S. at 489).

In this case, the district court concluded that DirecTV failed at step three because its "injury—lost profits resulting from the blackouts—does not flow from that which makes Defendants' acts unlawful." *DIRECTV*, 724 F. Supp. 3d at 278. In reaching that conclusion, the district court explained that "[t]he antitrust harm that flows from horizontal price fixing is the payment of supracompetitive prices." *Id.* According to the district court, because DirecTV rejected the demand for supracompetitive prices and therefore never made a payment, it could not establish antitrust injury. *See id.*

We conclude that the district court erred by limiting the cognizable antitrust injury to the payment of supracompetitive prices and excluding the antitrust injury of reduced output. Horizontal price fixing harms competition by "directly interfering with the free play of market forces." *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 221 (1940); *see also Gelboim*, 823 F.3d at 774 ("[H]orizontal price-fixing is anathema to an economy predicated on the undisturbed interaction between supply and demand."). When firms engage in price fixing, "[p]rice is higher and output lower than they would otherwise be, and both are unresponsive to consumer preference." *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 107 (1984). Buyers must pay more

17

than they would in a competitive market, and output declines as "fewer consumers are willing to purchase" goods at inflated prices. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 336 n.3 (2d Cir. 2008) (Sotomayor, J., concurring); *see also Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 777 (1999) ("If firms raise price, the market's demand for their product will fall, so the amount supplied will fall too—in other words, output will be restricted.") (quoting *Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*, 744 F.2d 588, 594 (7th Cir. 1984)).

The injuries associated with inflated prices and with reduced output both flow from a horizontal price-fixing conspiracy. According to the complaint, the defendants' conspiracy forced DirecTV to choose either to pay inflated prices "or lose access to the most popular broadcast television programming." App'x 14 (¶ 4). When DirecTV refused to pay the supracompetitive prices, the price-fixing conspiracy achieved its expected effect—a reduction in output through blacked-out stations. Because "subscriber losses [are] associated with a broadcast station group's stations going dark," *id.* at 29 (¶ 64), the lost profits flowed directly from this output reduction. The antitrust laws prohibit price fixing to avoid such an artificial reduction in output. In this way, the alleged injury flowed from an anticompetitive effect that the antitrust laws aim to prevent: the artificial suppression of output "below levels dictated by consumer demand." *City of Oakland v. Oakland Raiders*, 20 F.4th 441, 457 (9th Cir. 2021). We conclude that DirecTV has plausibly alleged an antitrust injury.

**B**

We next consider whether DirecTV is an efficient enforcer of the antitrust laws. Whether a plaintiff is an efficient enforcer depends on four factors:

> (1) the directness or indirectness of the asserted injury; (2) the existence of more direct victims or the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement; (3) the extent to which the claim is highly speculative; and (4) the importance of avoiding either the risk of duplicate recoveries on the one hand, or the danger of complex apportionment of damages on the other.

*In re Platinum & Palladium Antitrust Litig.*, 61 F.4th 242, 259 (2d Cir. 2023) (quoting *Am. Express*, 19 F.4th at 138). "These four factors need not be given equal weight: the relative significance of each factor will depend on the circumstances of the particular case." *IQ Dental Supply, Inc. v. Henry Schein, Inc.*, 924 F.3d 57, 65 (2d Cir. 2019).

The district court decided that DirecTV failed to establish that it is an efficient enforcer of the antitrust laws. We disagree and conclude that it is an efficient enforcer.

**1**

"The first efficient-enforcer factor—'whether the violation was a direct or remote cause of the injury'—turns on 'familiar principles of proximate causation.'" *Platinum & Palladium*, 61 F.4th at 259 (quoting *Am. Express*, 19 F.4th at 139). "In the context of antitrust standing, proximate cause generally follows the first-step rule," which requires "some direct relation between the injury asserted and the injurious conduct alleged." *Am. Express*, 19 F.4th at 139-40

(internal quotation marks omitted). Under the first-step rule, "injuries that happen at the first step following the harmful behavior are considered proximately caused by that behavior. Accordingly, 'directness in the antitrust context means close in the chain of causation.'" *Id.* at 140 (alteration omitted) (quoting *Gatt*, 711 F.3d at 78).

In this case, DirecTV plausibly alleges a direct injury from the purported price-fixing conspiracy. The defendants conspired to raise the price of DirecTV's retransmission consent fees to supracompetitive levels that priced DirecTV out of the market. Without RCAs with Mission and White Knight, DirecTV reduced its output by blacking out the transmission of broadcast content for nearly one million subscribers. Because consumers generally do not pay the same amount for less supply, DirecTV suffered a loss of revenue from canceled subscriptions.

This injury occurred at the first step following the defendants' price-fixing conspiracy. As alleged in the complaint, the defendants fixed prices specifically to force DirecTV either to pay supracompetitive retransmission fees or else to lose access to Mission's and White Knight's networks and "suffer the broader potential subscriber losses associated with … [such] stations going dark." App'x 29 (¶ 64). The reduced output—and the associated loss of profits—was not a "remote" consequence of the alleged antitrust violation but a direct result of the conspiracy to fix the prices of retransmission rights.

The district court's contrary conclusion rested on the premise that DirecTV was harmed only incidentally or indirectly because it "did not pay higher prices, but claims to have suffered by losing customers due to the blackouts." *DIRECTV*, 724 F. Supp. 3d at 280.

The payment of supracompetitive prices is one way that fixing the price of an input may cause injury. But losses from being forced to reduce output follow just as directly from anticompetitive price fixing.

The district court characterized DirecTV's injury as resulting from an attenuated causal chain involving multiple speculative steps. The district court described a sequence that began with price fixing, which led to failed negotiations, which then resulted in blackouts, which in turn caused subscriber losses, which finally culminated in lost profits. *See id.* The first-step rule, however, turns not on the literal mechanics of anticompetitive effects but on "familiar principles of proximate causation." *Am. Express*, 19 F.4th at 139 (quoting *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 412 (2d Cir. 2014)). In this case, forcing DirecTV to choose between increased prices and reduced output was the object of the conspiracy. There were no intermediate victims whose injuries caused DirecTV to suffer harm in turn. And both increased prices and reduced output are consequences of horizontal price fixing that would be expected—and allegedly were expected—to cause a purchaser to suffer losses. *See* App'x 29 (¶ 64)**.** The losses here represented the direct, foreseeable, and indeed intended consequence of the defendants' alleged price-fixing scheme.

This case differs from others applying the first-step rule in antitrust cases. In *American Express Anti-Steering Rules Antitrust Litigation*, the plaintiffs—commercial merchants—did not accept Amex cards and claimed injury only because "Amex's competitors, covered by Amex's price umbrella, raised their own prices." 19 F.4th at 141. The plaintiffs' theory was that "Amex's imposition of increased merchant fees enabled the competitor companies to increase their own merchant fees," which the plaintiffs then had to pay. *Id.* (internal quotation marks omitted). We held that the

21

plaintiffs' injury occurred at a "later step" because the plaintiffs had no direct relationship with Amex and their alleged harm flowed from the reactions of Amex's competitors to Amex's direct transactions with its own subscribers. *Id.* at 135.

In *Platinum and Palladium Antitrust Litigation*, KPFF—a non-transacting plaintiff—was allegedly injured because the defendants' manipulation of benchmark prices for platinum and palladium led non-conspiring third parties to raise their prices. *See* 61 F.4th at 259-60. We held that KPFF's injury was indirect because it flowed through an attenuated causal chain dependent on the reactions of third parties to the manipulated benchmark. "The only transactions that were required to adopt the benchmark prices were those into which the defendants entered as part of the [price fixing], and KPFF has concededly not transacted with the defendants." *Id.* at 260.

In this case, by contrast, DirecTV was the counterparty negotiating RCAs with the defendants. It suffered a direct injury from the defendants' coordinated price demands in those negotiations. The theory of antitrust injury here does not depend on the reactions of other market participants who themselves transacted directly with the defendants. "[I]f there are direct victims of the alleged conspiracy," the direct victim must be the intended target of the conspiracy and the direct counterparty: DirecTV. *Am. Express*, 19 F.4th at 140 (quoting *Gatt*, 711 F.3d at 79). Because the alleged injury occurred at the first step following the defendants' conduct, the first factor favors antitrust standing.

## 2

The second efficient-enforcer factor focuses on the existence of more direct victims. We ask whether there is "an identifiable class of persons whose self-interest would normally motivate them to

vindicate the public interest in antitrust enforcement." *Id.* at 141 (quoting *IQ Dental Supply*, 924 F.3d at 65). "Although the existence of more-motivated plaintiffs is not dispositive, the presence of plaintiffs who are better situated to vindicate the antitrust laws is relevant to this second factor," *IQ Dental Supply*, 924 F.3d at 66, because it "diminishes the justification for allowing a more remote party … to perform the office of a private attorney general," *AGC*, 459 U.S. at 542.

Our cases illustrate when the second factor disfavors antitrust standing. In *IQ Dental Supply*, we explained that the plaintiff lacked antitrust standing because it was "further removed from the harm" than parties "directly affected by the boycott that have already sued the Defendants." 924 F.3d at 66. In *American Express*, merchants who had direct relationships with Amex and "were harmed at the first step by Amex's Anti-Steering Rules" had separately sued. 19 F.4th at 141. In *Platinum and Palladium*, the existence of platinum and palladium sellers who directly transacted with the defendants "diminishe[d] the justification for allowing a more remote party to perform the office of a private attorney general." 61 F.4th at 261 (internal quotation marks omitted).

This case involves a different scenario. Here, the second factor favors antitrust standing because DirecTV alleges that it was the specific and direct target of the defendants' price-fixing conspiracy. The defendants argue that "MVPDs that actually paid [the] purportedly supracompetitive prices would be more 'efficient enforcers' to bring this antitrust claim." Appellees' Br. 50. But the complaint does not allege that the defendants targeted other MVPDs or that other MVPDs paid fixed prices. Instead, the complaint alleges that the conspiracy specifically aimed to establish high pricing benchmarks for Nexstar's upcoming renewal negotiations *with DirecTV*.

Unlike our other cases—in which the plaintiffs had a more remote connection to the anticompetitive conduct than other potential or actual plaintiffs—the allegations here indicate that DirecTV was the sole target of the conspiracy. Taking the allegations as true, we can identify no more direct victims of the defendants' alleged anticompetitive conduct. For that reason, "'[d]enying [DirecTV] a remedy on the basis of its allegations' is 'likely to leave a significant antitrust violation undetected or unremedied.'" *Am. Express*, 19 F.4th at 141 (quoting *AGC*, 459 U.S. at 542). The second factor favors antitrust standing.

**3**

"The third efficient-enforcer factor concerns the extent to which the claim is 'highly speculative.'" *Id.* (quoting *AGC*, 459 U.S. at 542). "Under this factor, we ask whether there would be 'a high degree of speculation in a damages calculation.' When an injury is 'derivative' rather than direct, the potential recovery is often 'highly speculative.'" *Id.* (citation omitted) (quoting *IQ Dental Supply*, 924 F.3d at 66-67). "We also consider whether the 'alleged effects on the [plaintiff] may have been produced by independent factors.'" *Id.* (quoting *AGC*, 459 U.S. at 542).

The defendants argue that DirecTV's claim that it is an efficient enforcer fails this factor for two reasons. First, "buyers allegedly priced out of the market typically are inefficient enforcers because their damages are both too indirect and speculative." Appellees' Br. 10 (internal quotation marks omitted). According to the defendants, "'[a] nonpurchaser's injury is … highly speculative' because 'we cannot know' what would have happened absent the alleged price-fixing," *id.* at 53 (quoting *City of Oakland*, 20 F.4th at 449), and "[a]nyone could claim that he or she would have purchased at the

24

competitive price but was priced out of the market as a result of the anticompetitive pricing," *id.* at 29 (quoting Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 391 (4th ed. 2014)). Second, DirecTV's theory of damages rests on "critical assumptions" about whether the parties would have reached an agreement absent collusion and whether subscribers would have remained with DirecTV. *Id.* at 53. The defendants contend that "[t]here is no way to know whether and on what terms the parties would have agreed to a retransmission consent agreement or what lost subscribers can be attributed to the failed retransmission consent agreement negotiations." *Id.*

Neither argument is persuasive. First, as we have already explained, DirecTV's injury of lost profits is direct rather than derivative. This is not a case involving a hypothetical purchaser that speculates about what profits it could have obtained if it could have bought at competitive prices. Rather, DirecTV began with a baseline in which it had RCAs with Mission and White Knight; it can identify concrete losses of subscribers and profits during the blackout periods that occurred when those RCAs terminated. Second, DirecTV alleges a prior course of dealing in which "the parties had a longstanding history of reaching agreements every three years." Appellant's Br. 38. That history provides a benchmark for assessing the effect of the alleged conspiracy. *See Montreal Trading Ltd. v. Amax Inc.*, 661 F.2d 864, 868 (10th Cir. 1981) ("When the nonpurchaser can show a regular course of dealing with the conspirators, injury may not be inherently speculative.").

This case does not resemble those in which courts have rejected nonpurchaser claims based on concerns about unlimited liability or speculative damages. *See, e.g.*, *id.* at 867-68. Unlike cases involving parties who never dealt with the defendants and seek to recover

hypothetical lost profits, the allegations here reflect a preexisting business relationship with the defendants and a distinct measure of damages. *Cf. In re Pandora Media, LLC*, No. 22-CV-809, 2022 WL 19299126, at *7 (C.D. Cal. Oct. 26, 2022) (concluding that the alleged antitrust injury was not speculative when the plaintiff alleged a "status quo" of individual licensing practices before the defendant's formation and alleged that the defendant's "formation and aggregation of comedians' works [was] the cause of [the plaintiff] either paying supracompetitive royalties or ceasing offering streamed comedy performances"). We conclude that calculating damages would not be so "highly speculative" that DirecTV should be denied antitrust standing based on the third factor. *Am. Express*, 19 F.4th at 141 (quoting *AGC*, 459 U.S. at 542).

**4**

The fourth efficient-enforcer factor reflects the importance of "avoiding either the risk of duplicate recoveries on the one hand, or the danger of complex apportionment of damages on the other." *Id.* at 142 (quoting *AGC*, 459 U.S. at 543-44). This factor "guards against 'pass-on theories that would require a court to divide damages from the same violation among multiple plaintiffs.'" *Platinum & Palladium*, 61 F.4th at 261 (quoting *Am. Express*, 19 F.4th at 143). "The concern arises when '[t]he damages to which [the plaintiff] lays claim' are 'exactly the same damages [other parties] could have claimed.'" *Am. Express*, 19 F.4th at 142 (quoting *IQ Dental Supply*, 924 F.3d at 67).

This factor does not undermine DirecTV's claim to antitrust standing. The allegations indicate that DirecTV was the target of the conspiracy and no other MVPDs have brought similar antitrust claims against the defendants. This case does not rely on "pass-on theories

that would require a court to divide damages from the same violation among multiple plaintiffs." *Id.* at 143.

Based on the efficient-enforcer factors, we conclude that DirecTV has plausibly alleged that it is an efficient enforcer of the antitrust laws in this case. Accordingly, DirecTV has antitrust standing to proceed on its federal antitrust claims. We reverse the judgment insofar as the district court dismissed the complaint based on the opposite conclusion. Because the dismissal of the federal antitrust claims affected the decision of the district court to decline to exercise supplemental jurisdiction over the remaining state law claims, we vacate the judgment insofar as the district court declined to consider those claims.

## CONCLUSION

We reverse the judgment insofar as the district court held that DirecTV lacked antitrust standing to pursue its federal antitrust claims. We vacate the judgment insofar as the district court declined to exercise supplemental jurisdiction over the state law claims. We remand to the district court for further proceedings consistent with this opinion.

RICHARD J. SULLIVAN, *Circuit Judge*, dissenting:

Whether or not DirecTV suffered an "antitrust injury" in this horizontal price-fixing case, I agree with the district court that DirecTV failed to show that it is an "efficient enforcer" of the antitrust laws – as it must to have standing to sue. *See In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 158 (2d Cir. 2016). For that reason, I respectfully dissent.

To establish antitrust standing, a plaintiff must show (1) an "antitrust injury," and (2) "that he is a proper plaintiff in light of four efficient enforcer factors." *Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*, 22 F.4th 103, 115 (2021) (alteration adopted and internal quotation marks omitted). The efficient-enforcer inquiry asks whether a "plaintiff is a proper party to perform the office of a private attorney general and thereby vindicate the public interest in antitrust enforcement." *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 780 (2d Cir. 2016) (internal quotation marks omitted). That analysis, in turn, weighs "(1) whether the violation was a direct or remote cause of the injury; (2) whether there is an identifiable class of other persons whose self-interest would normally lead them to sue for the violation; (3) whether the injury was speculative; and (4) whether there is a risk that other plaintiffs would be entitled to recover

duplicative damages or that damages would be difficult to apportion among possible victims of the antitrust injury." *Id.* at 772 (internal quotation marks omitted). No single factor is dispositive, and the four factors "need not be given equal weight: the relative significance of each factor will depend on the circumstances of the particular case." *IQ Dental Supply, Inc. v. Henry Schein, Inc.*, 924 F.3d 57, 65 (2d Cir. 2019).

While I agree with the majority's assessment of the second and fourth factors, I believe those factors are outweighed by serious defects under the first and third factors given the indirect and speculative nature of DirecTV's purported harm. DirecTV first argues that Mission, White Knight, and Nexstar (together, "Defendants") colluded to demand higher, anticompetitive retransmission agreement ("RCA") fees, and that but for those "supra[-]competitive, price-fixed demands," DirecTV would have reached an agreement with both Mission and White Knight to renew the RCAs. J. App'x at 51–52. According to DirecTV, it then would have offered subscription packages containing Defendants' stations to its customers, thus avoiding the channel blackouts that resulted from the parties' failure to reach a deal and the cancellations by DirecTV subscribers who were angered by the blackouts. *See id.* at 56–57.

2

But in assessing the directness of an antitrust injury, we follow proximate-cause principles – not speculative chains of but-for causation. *See In re Am. Express Anti-Steering Rules Antitrust Litig.*, 19 F.4th 127, 134–35 (2d Cir. 2021). Under the first-step rule, "injuries that happen at the first step following the harmful behavior are considered proximately caused by that behavior." *Schwab*, 22 F.4th at 116 (internal quotation marks omitted). There must, however, be "some direct relation between the injury asserted and the injurious conduct alleged." *Am. Express*, 19 F.4th at 140 (internal quotation marks omitted). It is "not enough" that a particular plaintiff "suffered a loss in some manner that might conceivably be traced to the conduct of the defendants." *Schwab*, 22 F.4th at 116 (internal quotation marks omitted). To the contrary, "[d]irectness in the antitrust context means close in the chain of causation." *Gatt Commc'ns, Inc. v. PMC Assocs., LLC*, 711 F.3d 68, 78 (2d Cir. 2013) (internal quotation marks omitted).

The majority insists that DirecTV suffered "a *direct* injury from the purported price-fixing conspiracy," Maj. Op. at 20 (emphasis added), but the reality is that DirecTV's harms occurred much further down the causal chain. To begin, DirecTV acknowledges that it "is a buyer (*i.e.*, a consumer) in the retransmission consent market," J. App'x at 78 (quoting Dist. Ct. Doc. No. 60 at

3

14), rather than a competitor of Defendants. When confronted with the choice of paying "higher prices" or "los[ing] access to Mission's and White Knight's networks," DirecTV chose "the lesser of two evils" and "refused Defendants' [allegedly] supra[-]competitive demands." *Id.* at 71 (first quoting Dist. Ct. Doc. No. 1 ¶ 156, then citing *id.* ¶ 2). But we have recognized that non-purchasers – those buyers who did not "buy at higher prices" stemming from collusive price-fixing, *Port Dock & Stone Corp. v. Oldcastle Ne. Inc.*, 507 F.3d 117, 124 (2d Cir. 2007) – will struggle to show a direct injury because they "did not pay higher prices by virtue of the conspiracy," *Gatt*, 711 F.3d at 79; *see also* 2A Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 335c(3) (2014) ("Areeda & Hovenkamp") ("Beyond the actual customers, most other plaintiffs would be classified as 'remote' and denied standing.").

That makes sense. The antitrust laws fashion a remedy for those who "*pay* excessive prices"; they do not "provide a remedy in damages for *all* injuries that might conceivably be traced to an antitrust violation." *Assoc. Gen. Contractors of Cal., Inc. v. Cal. St. Council of Carpenters* ("*AGC*"), 459 U.S. 519, 530, 534 (1983) (emphases added and internal quotation marks omitted). Greenlighting DirecTV's

attenuated theory of injury therefore undercuts the very foundation of the antitrust laws.

Other circuits have recognized as much. The Ninth Circuit, for example, has explained that while buyers who pay supra-competitive prices "ordinarily have antitrust standing," those "who are priced out [of] the market – and hence do not purchase the product or pay the overcharge – ordinarily do not" because their injuries are "less direct" than those of parties who actually "agree[d] to supra[-]competitive prices." *City of Oakland v. Oakland Raiders*, 20 F.4th 441, 448–49, 459 (9th Cir. 2021). The Tenth Circuit has likewise acknowledged that a price-fixing conspiracy is "certainly aimed at those who purchase the product at the inflated price" because their injury is both "more direct and more proximately caused than those [buyers] who are unable to purchase." *Montreal Trading Ltd. v. Amax Inc.*, 661 F.2d 864, 867 (10th Cir. 1981) (internal quotation marks omitted). So too here.

Indeed, "[t]he disconnect between [DirecTV's] injury" – lost profits – and "[Defendants'] alleged benefit" underscores "the attenuated nature of the causal chain." *Schwab*, 22 F.4th at 116. For starters, DirecTV does not allege that Defendants "secured [an] illegal benefit at [DirecTV's] expense," *Mid-W. Paper Prods. Co. v. Cont'l Grp., Inc.*, 596 F.2d 573, 583 (3d Cir. 1979), since DirecTV's lost

5

profits "in no way enriched [Defendants]," *Schwab*, 22 F.4th at 116. To the extent DirecTV argues that White Knight and Mission drove up the price it would later pay Nexstar, that purported harm had not been realized when DirecTV filed its complaint. And we have emphasized that merely "enabling other . . . companies to raise . . . fees does not establish [a] direct relation between injury and [the alleged] antitrust violation." *Am. Express*, 19 F.4th at 141 (alteration adopted and internal quotation marks omitted).

Put simply, because there is no "direct connection between the harm and the alleged antitrust violation," *id.* at 143, the first efficient-enforcer factor weighs against DirecTV's antitrust standing.

The third efficient enforcer factor – whether the damages are "highly speculative" – likewise signals that DirecTV is an "inefficient engine of enforcement." *Gelboim*, 823 F.3d at 779. "A leading antitrust treatise," *Apple Inc. v. Pepper*, 587 U.S. 273, 283 (2019), has emphasized that the injuries of those consumers "who refused to purchase at the cartel price" are innately "speculative," since "[a]nyone could claim that he or she would have purchased at the competitive price but was priced out of the market as a result of the anticompetitive pricing," Areeda & Hovenkamp ¶ 391b(1) (emphasis deleted).

That principle applies here. While DirecTV's damages theory may be "simple to articulate" – lost profits from the cancellation of subscriptions – it would be exceedingly "difficult to apply" because it relies on a chain of speculative assumptions. *Schwab*, 22 F.4th at 119. *First*, DirecTV assumes that the parties would have reached an agreement. But we are left to speculate not only as to whether the parties would have come to terms, but at what price and when. Tellingly, the complaint contains no basis for estimating what the terms would have been had the parties reached a competitive price. *See Montreal Trading*, 661 F.2d at 868 ("[W]e will remain unsure about many things, including: whether the purchase would have been made from one of the conspirators or from one of their competitors; what quantity would have been purchased; what price would have been paid; and at what price resale would have occurred."). Indeed, as Defendants point out, DirecTV has a history of failed RCA negotiations resulting in blackouts independent of alleged anticompetitive activity. *See, e.g., In re Customer Rebates for Undelivered Video Programming During Blackouts*, Notice of Proposed Rulemaking, MB Doc. No. 24-20, FCC-24-2, ¶ 3 & n.7 (Jan. 17, 2024) (noting "dramatic[]" increase in number of blackouts).

7

*Second*, DirecTV assumes that its subscribers would have stayed with DirecTV but for Defendants' supra-competitive prices. But this too involves flights of speculation. DirecTV's own complaint acknowledges that DirecTV felt increasing pressure resulting from "higher subscription prices for [DirecTV's] video product." J. App'x at 29 (quoting Dist. Ct. Doc. No. 1 ¶ 62); *see also id.* at 23–24 (complaint emphasizing that "what was once a free product has become an increasingly costly burden on millions of American households" (quoting Dist. Ct. Doc. No. 1 ¶ 42)). Moreover, DirecTV's parent company's 2020 Form 10-K indicated that its video business – "primarily DirecTV," Nexstar Br. at 21 – had been hemorrhaging customers in recent years, well before the allegedly supra-competitive pricing demanded by Defendants. *See* AT&T Inc., 2020 Form 10-K, at 35, 47 (Feb 25, 2021), tinyurl.com/4vy78ptr (AT&T reporting that its video business lost 1.19 million subscribers in 2018, 3.4 million in 2019, and 2.99 million in 2020). It is therefore "highly speculative" whether DirecTV customers canceled their subscriptions due to the specific blackouts identified here or whether those decisions were based on independent factors like price increases or competition from streaming services. *Schwab*, 22 F.4th at 119 (internal quotation marks

8

omitted); *see also AGC*, 459 U.S. at 542–43 (disfavoring "highly speculative" damages claims for efficient-antitrust enforcers).

Moreover, even if *some* of DirecTV's customers "followed through on their threats" and cancelled their subscriptions due to *these* blackouts, J. App'x at 56–57 (quoting Dist. Ct. Doc. No. 1 ¶ 190), we would still be required to estimate how *many* did so to calculate lost profits. DirecTV hypothesizes that "more than ten thousand subscribers have cancelled their . . . subscription as a result of the Mission blackout," *id.* at 57, and that "nearly three thousand subscribers cancelled . . . as a result of the White Knight blackout," *id.* at 58 (quoting Dist. Ct. Doc. No. 1 ¶ 202). But while DirecTV rehashes the messages from angry customers complaining that "the FOX broadcasting TV station has been off the air since the World Series and the NFL season," *id.* at 56, it does not indicate whether these customers *actually* cancelled their subscriptions or offer any formula for ascertaining the motivations of those who *did* cancel their subscriptions.

Finally, even if DirecTV had provided a satisfying estimate of how many subscriber cancellations were attributable to the blackouts, we would still have to calculate DirecTV's lost profits. Given the "speculative nature of the harm," I do not see how we could do so with the required "reasonable level of certainty." *City*

9

*of Oakland*, 20 F.4th at 460. Indeed, it is possible that DirecTV's bottom line remained unaffected by the temporary blackouts, since the lost revenues from cancellations may have been offset by cost savings on fees that would otherwise have been paid to Defendants. All of this makes it "difficult to see how [DirecTV] would arrive at an estimate [of lost profits], even with the aid of expert testimony." *Gelboim*, 823 F.3d at 779. Bearing in mind that "antitrust discovery can be expensive" (to say the least), I would demand more "specificity in [DirecTV's] pleading before allowing [this] potentially massive factual controversy to proceed." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007) (internal quotation marks omitted).

Before today, no circuit had held that a priced-out non-purchaser like DirecTV plausibly alleged antitrust standing. Though the Ninth and Tenth Circuits have each recognized that a non-purchaser may suffer an antitrust injury as a legal matter, each declined to find that the plaintiff before it had made the requisite showing. *See City of Oakland*, 20 F.4th at 460; *Montreal Trading*, 661 F.2d at 867–68. In the words of the Ninth Circuit: "Non[-]purchasers who are priced out of the market" present a "special problem[] due to the speculative nature of the harm." *City of Oakland*, 20 F.4th at 460; *Cf. Simon v. KeySpan Corp.*, 694 F.3d 196,

10

201 (2d Cir. 2012) ("Generally, only direct purchasers have standing to bring civil antitrust claims.").

The majority attempts to skirt this problem by pointing to DirecTV's "prior course of dealing" with Defendants, which it insists "provides a benchmark for assessing the effect of the alleged conspiracy." Maj. Op. at 25; *see also* DirecTV Br. at 38. Because other circuits have *suggested* that "a regular course of dealing with the conspirators" can make a party's claimed injuries something other than "inherently speculative," Maj. Op. at 25 (quoting *Montreal Trading*, 661 F.2d at 868), the majority maintains that DirecTV too is an efficient enforcer.

I am unconvinced. DirecTV's alleged "longstanding history of reaching agreements every three years," DirecTV Br. at 39, is wholly conclusory and encompasses a few threadbare paragraphs of the complaint, J. App'x at 36–37, 44 (citing Dist. Ct. Doc. No. 1 ¶¶ 90, 95, 126). Indeed, the complaint describes just one prior dealing between the parties before the breakdown in negotiations in 2022. *See id.* at 36. Such allegations, asserting a single set of negotiations, are simply too sparse to establish a meaningful benchmark for determining the effect of the alleged conspiracy. At most, the complaint alleges that the fees requested in 2022 "were radically disproportionate to the number of stations owned by White

11

Knight and Mission" and "*seemed* intentionally calculated to prevent the parties from reaching an agreement." *Id.* at 37 (emphasis added) (quoting Dist. Ct. Doc. No. 1 ¶¶ 97, 99). But neither allegation references the fees paid in 2019; each merely notes that fees have generally "increased" since the mid-2000s. *See id.* at 23. And nothing in the complaint suggests what, if anything, changed in 2022. The third efficient-enforcer factor therefore counsels against finding that DirecTV has antitrust standing.

* * *

Ultimately, the "key principle underlying th[e efficient-enforcer] test is proximate cause." *Am. Express*, 19 F.4th at 143. Even if the second and fourth factors weigh in DirecTV's favor, the indirect nature of the injury and the highly speculative quality of DirecTV's damages torpedo the "required direct connection between the harm and the alleged antitrust violation." *Id.* For these reasons, I remain convinced that DirecTV is an inefficient enforcer, and that it therefore "lack[s] antitrust standing." *Id.* Because the majority concludes otherwise, I respectfully dissent.